AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

**FILED**

# United States District Court

NOV 0 2 2017

**EASTERN** District of **CALIFORNIA**   CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

|  |  |
|---|---|
| In the Matter of the Seizure of | **APPLICATION FOR A WARRANT TO SEIZE** |
| *(Briefly describe the property to be seized)* | **PROPERTY SUBJECT TO FORFEITURE** |

All funds maintained at Mechanics Bank account
number 42073421, held in the name of Lemon
Gold Ventures, Inc.

CASE NUMBER:

**2 1 7 - SW - 0 9 6 2   EFB**

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the
 **EASTERN** District of _**CALIFORNIA**_ is subject to forfeiture to the United States of America *(describe the property)*:

All funds maintained at Mechanics Bank account number 42073421, held in the name of Lemon Gold Ventures, Inc.

The property is subject to seizure pursuant to 18 U.S.C. § 981(b) and subject to forfeiture pursuant to 18 U.S.C §§ 981(a)(1)(A), 981(a)(1)(C), and 984, concerning violations of 18 U.S.C. §§ 1955 and 1956.

The application is based on these facts:

**See attached affidavit.**

☒ Continued on the attached sheet.

**SEALED**

_____
*Applicant's signature*

Jason E. Lamb, Special Agent, IRS-CI
*Printed name and title*

Sworn to before me and signed in my presence.

_____
Date

11 - 1 - 2017

_____
*Judge's signature*

Sacramento, California
City and State

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF JASON E. LAMB
## IN SUPPORT OF SEARCH AND SEIZURE WARRANTS

I.      BACKGROUND AND EXPERTISE OF THE AFFIANT ................................................................4

II.     INTRODUCTION ................................................................................................................6

III.    NATURE OF APPLICATION ................................................................................................8

IV.     STATE LAW VIOLATIONS ..................................................................................................8

V.      PROBABLE CAUSE ..........................................................................................................10

   A.   Background ..................................................................................................................10

   B.   Statements by James Mecham as Managing Director of SweepsCoach .........................11

        i.    "A New Place to Gamble"- East Bay Express, February 2, 2011 .............................12

        ii.   "Strip-Casinos Multiply Across Nation"- Bloomberg Businessweek, April 22, 2011 ..........................13

        iii.  "Alameda County tells Internet cafes to stop sweepstakes games or close"- Contra Costa Times, March 29, 2013 ................................................................14

   C.   SweepsCoach Website- www.sweepstakesmachines.com ............................................14

   D.   Gaming Software Provider ............................................................................................15

        i.    Hurrington Group, KFT, Budapest, Hungary ........................................................16

   E.   The Involved Entities ....................................................................................................17

        i.    "The SweepsCoach Entities" ..............................................................................17

        ii.   Entities Created Solely to Receive Gambling Monies ............................................18

   F.   Law Enforcement Operations- California .......................................................................21

        i.    (Search Warrant #1)  Funsweeps- 2902 Auburn Blvd, Sacramento, CA- February 14, 2013 ..............25

        ii.   (Undercover Operation #1)  Bullseye Internet Café- 402 Colusa Avenue, Yuba City, CA- March 7, 2013 ................................................................25

        iii.  (Undercover Operation #2)  Biz Max Internet- 5581 Hillsdale Blvd, Sacramento, CA- October 10, 2013 ................................................................26

        iv.   (Undercover Operation #3)  Net Zone- 6825 Stockton Blvd, Sacramento, CA- March 26, 2014 ........26

        v.    (Search Warrant #2)  Mi Expresso Café- 1017 Bear Mountain Blvd, Arvin, CA- March 11, 2016 .......26

        vi.   (Inspection and Search Warrant #3)  Dang Cafe- 13100 Magnolia Ave, Corona, CA- November 10, 2016 and March 16, 2017 ................................................29

        vii.  (Search Warrant #4)  Netzone Internet Café and Business Center- 9915 S. Union Avenue, Bakersfield, CA- July 26, 2017 ................................................32

   G.   Law Enforcement Operations- Arizona ..........................................................................32

    i.    (Inspection)  Elbow Room- 1145 W. Prince Road, Tucson, AZ- November 18, 2015 ......................... 32

  H.    Ongoing and Current Criminal Activity of the SweepsCoach Entities ...................................... 33

VI.      PROBABLE CAUSE REGARDING SPECIFIC LOCATIONS ........................................................... 35

  A.    877 Embarcadero Drive, Suite 1, El Dorado Hills, California and connected storage area ..................... 35

  B.    895 Embarcadero Drive, Suite 104, El Dorado Hills, California ............................................... 39

  C.    5110 Steves Way, El Dorado Hills, California ................................................................. 41

  D.    2489 Highland Hills Drive, El Dorado Hills, California ......................................................... 42

VII.    TRAINING AND EXPERIENCE RELATED TO GAMBLING SEIZURES ............................................. 43

VIII.    COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS ........................................... 44

IX.     SUMMARY OF PERTINENT FINANCIAL ANALYSIS ............................................................... 51

  A.    FORFEITURE THEORIES RELATIVE TO THE FINANCIAL ACCOUNTS ........................................... 58

  B.    PRIMARY DEPOSIT ACCOUNTS ................................................................................... 61

    i.    Account No. 1 – Abnom, Inc. dba Sweepscoach, Chase Bank Acct No. ***4887 ............................... 61

    ii.    Account No. 2 – James E Mecham, Sole Prop dba Sweepscoach, Bank of America Acct No. ***0817 62

    iii.    Account No. 3 – James Eric Mecham dba Abnom dba Stuff About Games, Wells Fargo Acct No. ***5676 ...................................................................................................... 62

    iv.    Account # 4 – Abnom, Inc. dba Sweepscoach dba Stuff About Games, Wells Fargo Acct ***6531 ... 64

    v.    Account # 5 – Burkiworks, Inc., Wells Fargo Acct ***7692 ................................................. 65

    vi.    Account # 6 – Burkiworks, Inc., Wells Fargo Acct ***3497 ................................................. 66

    vii.    Account # 7 – Burkiworks, Inc., Wells Fargo Acct ***7700 ................................................. 66

    viii.    Account # 8 - Burkiworks, Inc., Bank of America Acct ***4044 .......................................... 67

  C.    FLOW-THROUGH ACCOUNTS ...................................................................................... 69

    ix.    Account # 9 – James E Mecham, Sole Prop dba Sweepscoach, Bank of America Acct ***1415 ........ 70

    x.    Account # 10 – Stuff About Games, Wells Fargo Bank Acct ***1036 ...................................... 70

    xi.    Account # 11 – Lemon Gold Ventures, Inc., El Dorado Savings Bank Acct ***9728 ......................... 70

    xii.    Account # 12 – Liberty Revocable Family Trust, Golden One Credit Union Acct ***5278(9) ......... 71

    xiii.    Account # 13 – Baboon Productions, High Desert Bank Acct ***2813 ...................................... 71

    xiv.    Account # 14 – Black Rock Investments, Inc., Bank of the West Acct ***5629 ............................ 73

    xv.    Account # 15 – Lakeview Technology, Wyochem Federal Credit Union Acct ***648-S9 ............... 73

    xvi.    Account # 16 – Black Rock Investments, First Citizens Bank Acct ***6523 ................................... 75

    xvii.    Account # 17 – Lemon Gold Ventures, Inc., Bank of America Acct ***7073 ................................. 76

xviii.     Account # 18 – Lemon Gold Ventures, Inc., Bank of America Acct ***0675 ..............................77

xix.     Account # 19 – Lemon Gold Ventures, Inc., Mechanics Bank Acct ***3421 ..................................79

xx.     Account # 20 – Oakridge Management Group, 1ˢᵗ Bank, Division of Glacier Bank Acct ***8915 ..80

D.     HOLDING ACCOUNTS ............................................................................................................81

xxi.     Account # 21 – James E Mecham and Jenny E Mecham, Wells Fargo Bank Acct ***8213 ...........82

xxii.     Account # 22 – Madrone Ventures, Inc., Wells Fargo Bank Acct ***0552 .....................................83

xxiii.     Account # 23 – Phoenician Holdings, LP, Umpqua Bank Acct ***8368 ...........................................83

xxiv.     Account # 24 – Redwood Ventures, Inc., Bank of America Acct ***5652 .....................................84

xxv.     Account # 25 – Coyote Ridge Outfitters, Safe Credit Union Acct ***2910(9) ..............................85

xxvi.     Account # 26 – Madrone Ventures, Inc., El Dorado Savings Bank Acct ***2902 .........................86

xxvii.     Account # 27 – Pacific Ridge Management Group, Inc., High Desert Bank Acct ***2826..........87

xxviii.     Account # 28 – Santara Technology Solutions, Inc., Umpqua Bank Acct ***1948....................89

xxix.     Account # 29 – Sierra Executive Group, Inc., Tri-Counties Bank Acct ***9991 ..............................90

xxx.     Account # 30 – Washington Sinclair Technologies, Inc., Bank of America Acct ***7633...............91

xxxi.     Account # 31 – Cameo Holdings, Inc., UniWyo FCU Acct ***1324..................................................92

xxxii.     Account # 32 – Kurt Stocks, Patelco Credit Union Acct ***473661............................................94

X.     VEHICLES PURCHASED WITH PROCEEDS OF GAMING ............................................................95

A.     2015 Mercedes-Benz, ML350, VIN: 4JGDA5HB9FA479275 .........................................................95

B.     2016 Ford, F150 Super Cab Pickup, VIN: 1FTFX1EGXGKG04896.................................................95

C.     2017 Ford, F250 Super Duty Pickup, VIN: 1FT7X2BT6HEB22700................................................96

XI.     SEIZURE INFORMATION.............................................................................................................97

A.     Financial Accounts Requested for Seizure ................................................................................98

B.     Vehicles Requested for Seizure .................................................................................................98

XII.     CONCLUSION ............................................................................................................................98

XIII.     REQUEST FOR SEALING ...........................................................................................................101

## AFFIDAVIT OF JASON E. LAMB
## IN SUPPORT OF SEARCH AND SEIZURE WARRANTS

I, Jason E. Lamb, being duly sworn, depose and state as follows.

### I.    BACKGROUND AND EXPERTISE OF THE AFFIANT

1.    I have been a Special Agent with the IRS-Criminal Investigation ("IRS-CI") since August of 2000. I am presently assigned to the Sacramento, California office.

2.    In the course of my employment with IRS-CI, I have conducted or been involved in investigations of alleged criminal violations, which have included: Conspiracy to Defraud the Government with respect to Claims (Title 18 U.S.C. Section 286); Filing False, Fictitious, or Fraudulent Claims (Title 18 U.S.C. Section 287); Conspiracy (Title 18 U.S.C. Section 371); Identity Theft (Title 18 U.S.C. Section 1028(a)(7)); Access Device Fraud (Title 18 U.S.C. Section 1029(a)(7), wire fraud (Title 18 U.S.C. Section 1343), mail fraud (Title 18 U.S.C. Section 1341), illegal gambling businesses (Title 18 U.S.C. Section 1955), money laundering (Title 18 U.S.C. Section 1956), structuring violations (Title 31 U.S.C. Section 5324(a)(3)), tax evasion (Title 26 U.S.C. Section 7201) and filing of a false tax return (Title 26 U.S.C. Section 7206(1)).

3.    During the course of my Federal employment, I have attended over 1,000 hours of training in basic criminal investigation including over 400 hours of training specifically related to crimes investigated by IRS-CI.

4.    As a Special Agent with the Internal Revenue Service, I received training in accounting, investigative techniques, and financial analysis at the Federal Law Enforcement Training Center in Glynco, Georgia. I have successfully passed all courses at the training center, which included the Criminal Investigation Training Program and Special Agent Basic Training. This training included courses concentrating on the Internal Revenue Code, money laundering, and the Bank Secrecy Act. The training also

included instruction in the law of search and seizure under the Fourth Amendment of the United States Constitution and the execution of search warrants.

5.    I have participated in the execution of more than fifty federal search warrants involving the seizure of contraband and records including, but not limited to, telephone bills, correspondence, photographs that have identified co-conspirators, records pertaining to the purchase of real and personal property, bank records, escrow records, credit card records, tax returns, business books and records, and computer hardware and software.

6.    From my training and experience, I know that individuals normally maintain records of their financial activity in their residence or business locations, including receipts for expenditures by cash and check, bank records, and other financial documents. In addition, I know that transference of these items between locations is common and fluid with seemingly personal financial records found in a business setting and business records brought into the home. This practice has become commonplace as more industries have been found conducive to a work at home arrangement.

7.    Based on my training and experience, individuals who have accumulated wealth and assets will maintain those records as long as they own the assets and even after the asset has been disposed. I have observed persons who are attempting to conceal ownership of assets which are the fruits of a crime, direct correspondence to mailboxes or other addresses not directly connected to them. Furthermore, I have seen individuals place ownership of assets under the control of others or under entities to conceal the true ownership.

8.    From my training and experience as well as my consultations with other special agents with whom I have worked, I am aware that individuals maintain evidence for long periods of time for several reasons. First, to any individual, the evidence may seem innocuous (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal

Page 5  AFFIDAVIT OF Jason E. Lamb

calendars, telephone and address directories, checkbooks, photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). To law enforcement, however, such items may have significance and relevance when considered in light of other evidence. Second, the individual may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. Third, the individual may operate under the belief that he/she has deleted, hidden, or further destroyed electronic evidence, which in fact, may be retrievable by a trained forensic computer expert.

9.       I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, and (c) reports and memoranda of interview I have reviewed; (d) records subpoenaed by a federal grand jury; and (e) other sources of information as stated herein. However, I have not set forth every fact that I know of that is relevant to this investigation. Rather, I have set forth only the facts necessary to establish probable cause for the execution of this warrant.

## II.    INTRODUCTION

10.      The IRS-CI, in conjunction with the California Department of Justice Bureau of Gambling Control ("BGC"), the Federal Bureau of Investigation and the California Franchise Tax Board are conducting an investigation into various criminal offenses by JAMES MECHAM ("MECHAM"), KURT STOCKS ("STOCKS"), HEIDI EDWARDS ("EDWARDS"),  and others, for violations including, but not limited to: 18 U.S.C. § 371 (conspiracy to commit offenses against the United States); 18 U.S.C. § 1955 (operation of an illegal gambling business); 18 U.S.C. §§ 1956 and 1957 (money laundering); and 18 U.S.C. § 1962(c) and (d) (conducting and conspiring to conduct the affairs of an enterprise, which enterprise was engaged in, and

the activities of which affected, interstate or foreign commerce, through a pattern of racketeering activity, consisting of the operation of illegal gambling businesses). These offenses are being carried out in the Eastern District of California and elsewhere.

11.     As set forth more fully below, our investigation indicates that MECHAM, STOCKS and EDWARDS are involved in the management of a series of businesses that engage in and facilitate illegal gambling at locations throughout the United States to include California and Arizona, hereinafter the SweepsCoach Entities.[1] These businesses include: Abnom, Stuff About Games, SweepsCoach and Burkiworks. The SweepsCoach Entities can provide in-person support for owners of internet cafés and other similar storefront locations to operate illegal gambling businesses as well as access to a portal of gaming software. The SweepsCoach Entities provide access to the gaming software through a sale of "credits" or other similar terminology of items sold to an internet café operator who can sell them to a retail customer for access to online gaming.

12.     As described more fully herein, the gaming terminals used by café owners are essentially personal computers with internet access. Through the connection online, the computers become slot machines, where players can use credits to play a simple slot machine style game on a video screen and potentially win additional credits, which can be exchanged for money on site. SweepsCoach, through its owner, MECHAM, have claimed that the business model revolves around a legitimate "sweepstakes" offer, where the product being sold to a customer is "internet time" which sets it apart from other illegal gambling. However, the essential elements of gambling, that is, consideration, chance, and reward, remain just as applicable to their products and services, and cannot be obscured by false characterization.

---

[1] Throughout this affidavit, references to the SweepsCoach Entities will include at least one of the businesses associated with Mecham, Stocks or Edwards' gambling businesses.

Page 7  AFFIDAVIT OF Jason E. Lamb

13.     Based on a review of financial records, the SweepsCoach Entities gross gaming receipts from 2012 to 2017 exceed $14 million.

### III.     NATURE OF APPLICATION

14.     This application is submitted in support of warrants to search and seize documents and records, as described in Attachment B, on the following premises as more fully described in Attachments A-1 through A-4 hereto:

- 877 Embarcadero Drive, Ste 1 and adjoining storage space, El Dorado Hills, CA (SUBJECT BUSINESS PREMISES- SITE 1)

- 895 Embarcadero Drive, Ste 104 El Dorado Hills, CA (SUBJECT BUSNESS PREMISES- SITE 2)

- 5110 Steves Way, El Dorado Hills, CA (SUBJECT RESIDENCE- SITE 3)

- 2489 Highland Hills Drive, El Dorado Hills, CA (SUBJECT RESIDENCE- SITE 4)

15.     This application is also being submitted in support of multiple seizure warrants, more fully described below:

### IV.     STATE LAW VIOLATIONS

16.     An element of a violation under 18 U.S.C. § 1955 is that the gambling business violated the laws of the state(s) in which it was conducted. The relevant statues for California and Arizona are as follows:

### A. **California Penal Code § 330b**

17.     California Penal Code § 330b prohibits the use or possession of a slot machine.  The determination of whether a machine is a slot machine within the meaning of California law rests on three elements: "(1) the insertion of money or other object which causes the machine to operate; (2) the operation

of the machine is unpredictable and governed by chance; and (3) by reason of the chance operation of the machine, the user may become entitled to receive a thing of value." Trinkle v. California State Lottery, 105 Cal.App.4th 1401, 1410 (3d DCA 2003). The California Supreme Court has determined that software systems operating computer sweepstakes games on networked terminals are unlawful slot machines or devices under California law. People ex rel. Green v. Grewal, 352 P.3d 275 (Cal. 2015).

### B. **Arizona Revised Statute, § 13-3304**

18.     Arizona Revised Statute, § 13-3304 states that Benefiting from Gambling is a class 1 misdemeanor (A) Except for amusement or regulated gambling, a person commits benefiting from gambling if he knowingly obtains any benefit from gambling. Arizona Revise Statute§ 13-3301 defines as (1) "Amusement gambling" means gambling involving a device, game or contest which is played for entertainment if all of the following apply:

- The player or players actively participate in the game or contest or with the device.
- The outcome is not in the control to any material degree of any person other than the player or players.
- The prizes are not offered as a lure to separate the player or players from their money.
- Any of the following:
    - i.      No benefit is given to the player or players other than an immediate and unrecorded right to replay which is not exchangeable for value.
    - ii.      The gambling is an athletic event and no person other than the player or players derives a profit or chance of a profit from the money paid to gamble by the player or players.
    - iii.      The gambling is an intellectual contest or event, the money paid to gamble is part of an established purchase price for a product, no increment has been added to the price in connection with the gambling event and no drawing or lottery is held to determine the winner or winners.
    - iv.      Skill and not chance is clearly the predominant factor in the game and the odds of winning the game based upon chance cannot be altered, provided the game complies with any licensing or regulatory requirements by the jurisdiction in which it is operated, no benefit for a single win is given to the player or players other than a merchandise prize which has a wholesale fair

market value of less than ten dollars or coupons which are redeemable only at the place of play and only for a merchandise prize which has a fair market value of less than ten dollars and, regardless of the number of wins, no aggregate of coupons may be redeemed for a merchandise prize with a wholesale fair market value of greater than five hundred fifty dollars.

## V.   PROBABLE CAUSE

### A. Background

19.     According to online sources, including MECHAM's LinkedIn site, MECHAM's gaming experience began with online video gaming services and legitimate internet café locations.  Ultimately, MECHAM discovered the demand for internet based gambling which changed the direction of his business focus.  MECHAM himself discussed the transformation of his business operation in online articles, one which will be discussed below.  SweepsCoach, according to the website and MECHAM, claims to offer a legal "sweepstakes" type promotion to customers through an online outlet.  When SweepsCoach was the primary operating gaming business entity, MECHAM was registered as the owner, acted as the spokesman for the business, listed his home address on some governmental filings, and even listed the business address as 877 Embarcadero Drive, Suite 1, El Dorado Hills, California (SUBJECT BUSINESS PREMISES- SITE 1.)  When SweepsCoach was the primary entity associated to the gaming business, MECHAM collected the majority of the profits and paid several persons, including STOCKS and EDWARDS, in a manner that would make them appear to be employees.  When Burkiworks took over lead entity status from SweepsCoach in or about 2015, MECHAM began distancing himself on paper from the operation.  STOCKS was identified as a Director for Burkiworks in governmental filings while STOCKS and EDWARDS listed themselves as executives for the company when opening new bank accounts.

20.     During Burkiworks' installation as the lead entity, little changed operationally and customers still deposited checks directly into Burkiworks accounts rather than SweepsCoach accounts, with many writing "SweepsCoach" on deposit slips not understanding why the business had changed names.  One

additional change occurred when Burkiworks became the face of the gaming operation: the business address changed from 877 Embarcadero Drive, Suite 1, El Dorado Hills, California to 212 Elks Point Road in Zephyr Cove, Nevada. Nevertheless, surveillance has shown that MECHAM, EDWARDS and STOCKS have continued to work out of THE SUBJECT BUSINESS PREMISES- SITE 1.

21.     In the last year, MECHAM has established an office at 895 Embarcadero Drive, Suite 104, El Dorado Hills, California (SUBJECT BUSINESS PREMISES- SITE 2.) This location shares the same parking lot at SUBJECT BUSINESS PREMISES- SITE 1 and is located approximately 100 yards distant. Although MECHAM has entered 877 Embarcadero Drive, Ste 1, El Dorado Hills, California (SUBJECT BUSINESS PREMISES- SITE 1) on at least one occasion in 2017, his vehicle is primarily seen parked in front of SUBJECT BUSINESS PREMISES-SITE 2. On one occasion, MECHAM was observed delivering an object to STOCKS and the pair met in the parking lot to complete the exchange.

22.     Because the SweepsCoach Entities business can be operated remotely, it is unnecessary for an employee to be physically present at the business. Customers of SweepsCoach access gaming through a portal provided by a software provider on contract with the SweepsCoach entities which will be discussed below, not directly through the SweepsCoach office. The SweepsCoach website directs customers to an email or a 1-800 number for questions, which employees of the SweepsCoach Entities likely can access remotely from their devices at home or on the road. In 2015, surveillance of the business showed at least one employee present at 877 Embarcadero Drive, Suite 1, El Dorado Hills, California, most of the time. In 2017, even though business steadily increased, it is common for no employees to be present at the SweepsCoach/Burkiworks office during the work day. When STOCKS or EDWARDS were observed at the office in recent months, it is for brief periods of time, likely because most of their work is now performed remotely.

### B. Statements by James Mecham as Managing Director of SweepsCoach

23.     MECHAM has been vocal about his involvement in the internet gaming café business, even so far as speaking to the media about the legality of the industry and his own company's practices. SweepsCoach maintains a website at www.sweepstakesmachines.com and includes a link called "In the News" that provides a link to many of the articles where MECHAM speaks as an expert to media.  Below is a sample of statements given to media regarding the legality and the promotion of his business:

        i.     **"A New Place to Gamble"- East Bay Express, February 2, 2011**

24.     The article discussed internet cafés providing slot machine style gaming on computer terminals in the San Francisco area.  After law enforcement closed several local internet cafés a local reporter reached out to café owners for their opinion.  The reporter, acting in an undercover capacity, tried a café machine and found the computer was not set up for internet use and was exclusively designated for gaming, so the reporter reached out to MECHAM as an expert in the industry regarding the practice.

25.     MECHAM identified himself to the reporter as a "consultant who works for SweepsCoach, a company that helps people all over the country open sweepstakes gaming cafes."  MECHAM discussed how internet café gaming is similar to a sweepstakes game such as the McDonald's Monopoly game, except internet cafés provide internet time instead of hamburgers.  MECHAM stated that "his SweepsCoach business is booming all over the country- except in California.  That's because gambling laws here tend to be more rigid than elsewhere.  But that doesn't mean they're airtight."

26.     The article was posted online and one individual commented that California had declared the gambling cafe operations as illegal.  MECHAM responded to the post and included a link to his website at www.sweepstakesmachines.com.  MECHAM stated in his post: "Even though we are a California-based company, SweepsCoach hasn't helped anyone open sweepstakes internet cafés in California.  That should say something about our opinion of doing this kind of business in this state."

### ii.   "Strip-Casinos Multiply Across Nation"- Bloomberg Businessweek, April 22, 2011

27.    This article focused on internet café gaming in Seminole County, Florida. After a local ordinance was passed outlawing "mini-casinos" in the jurisdiction, internet gaming cafés filed lawsuits regarding the legality of the business model. The reporter spoke with MECHAM who identified himself as the "Managing Director" of SweepsCoach in Sacramento, California that "provides startup services to new sweepstakes cafes." MECHAM claimed to have helped open 200 cafés around the country in the years preceding this interview. MECHAM added that his "phones are ringing off the hook" and that "everybody wants to open one." meaning a gambling café. MECHAM further described the business as a "high-margin, cash-rich business" where each terminal at a "thriving café" typically grosses $1,000 to $5,000 per month.

28.    MECHAM said that in 2005 his company established traditional "internet cafés" without the gaming component. MECHAM heard about sweepstakes gaming cafes and moved his company in that direction. MECHAM stated that gaming software companies did not want to deal with the "logistical headaches of setting up mini-casinos in states where politicians, cops and lawmakers didn't want them." MECHAM claimed his company filled this niche and set up the cafés in exchange for payment from software companies. MECHAM added that: "When we first got into the sweepstakes, for the first six months we were taking a hide-in-the-bushes strategy. We didn't want to go to jail. I have a mortgage and a wife and five kids. I'm not going to jail over this. Now that I've been in it long enough, I realize it's pretty darn safe." MECHAM noted that SweepsCoach provides compliance training to new cafés which is "geared toward keeping them out of jail." However, he stated that wherever he has set up a sweepstakes business, "somebody soon tries to shut them down." MECHAM claimed that he tells clients: "If you're looking for a reason not to do this, read the news. But if you're looking for a reason to do it, look at someone's bank account who is in it. These guys make tons of money."

### iii.  "Alameda County tells Internet cafes to stop sweepstakes games or close"- Contra Costa Times, March 29, 2013

29.    The article focused on the closure of internet gaming cafes by authorities in Alameda County, California.  One of the closed businesses was "Net Connection" in Hayward, California operated by Ron Doyle.[2]

30.    MECHAM was contacted by the investigative reporter authoring a story about the closures. MECHAM identified himself as the managing director of SweepsCoach, a Sacramento-based company that helps set up new sweepstakes centers.  When the reporter pointed out the games feature slot machines, poker roulette and blackjack, making them appear like gambling, MECHAM responded: "We know that, that's the allure, people like to feel like they're gambling."  MECHAM continued that "the key piece is you're not buying a chance to win, is there a gray area?  Absolutely."

### C.  SweepsCoach Website- www.sweepstakesmachines.com

31.    The SweepsCoach website, www.sweepstakesmachines.com was accessed on January 20, 2016 and found to state that the internet café business is one of the hottest growth industries in America and offers to help people "set-up their internet café with games, which make you feel like you are playing slot machines and other casino games."  According to the website, SweepsCoach operates their gaming software under the name of "Promo Games."  The website states that most of their games are web-based and offer new businesses the benefit of using SweepsCoach's equipment (computer) and will convert old games into SweepsCoach games.  In addition, new customers can purchase equipment at a discount from SweepsCoach. The SweepsCoach site indicates that they "don't do a split contract agreement" in which a client pays between 40 to 50 percent of their profit and instead they charge a base of $3,000 per month.

---

[2] Net Connection had an ongoing business relationship with a company known as Capital Bingo in Loomis, California at the time of the articles' release.  On September 17, 2014, a federal search warrant was served on Capital Bingo for conduct similar to that of the SweepsCoach Entities.  In October of 2014, Net Connection established a new business relationship with the SweepsCoach Entitites.

32.     The website for SweepsCoach also addresses the legality of their product in the website's "Frequently Asked Question" section, defining the three elements of gambling as: "Prize, Chance, and Consideration." SweepsCoach claims their games have the elements of Prize and Chance; however, the Consideration is where their games differ from gambling. SweepsCoach again compares their game to the McDonald's Monopoly game where you buy food for a free chance to win a prize. SweepsCoach states that customers purchase internet time and products, and/or long distant phone time and as a result they get free entries to play. Below is SweepsCoach's attempt to explain why their gaming equipment is not "gambling:"

> i.    "This is exactly how sweepstakes gaming works in the internet café business. The customers don't actually purchase entries into the sweepstakes. They purchase time on the computer (internet time) or, in some cases, long-distance phone time. When they purchase this "product" they are given free entries into the sweepstakes. Instead of placing game pieces on a Monopoly board they go to the sweepstakes gaming system to reveal whether or not they have won. Simply put, the sweepstakes machines are our Monopoly game and the Internet or phone time is our cheeseburger. This makes it legal."

### D.  Gaming Software Provider

33.     MECHAM mentioned in the Bloomberg Businessweek interview that SweepsCoach would act as the bridge between the gaming software companies wary of local regulations and enforcement with internet café owners.  MECHAM stated that his company could: "fill the niche and receive payment from the software providers."  In practice, the SweepsCoach Entities provided an access for their retail internet café clients to the gaming software provider.  Rather than being paid by the software providers, the SweepsCoach Entities received payment directly from the internet café operators and then would make payment to the

gaming software provider.  A thorough review of the banking records identified a software provider named Hurrington Group, KFT, which received large and periodic payments from the SweepsCoach Entities.

### i.      Hurrington Group, KFT, Budapest, Hungary

34.      A search of online resources revealed that Hurrington Group, KFT is a provider of online gaming software including slot machine style software used by internet cafés affiliated with the SweepsCoach Entities.  A review of Hurrington Group, KFT website at:  www.promogames.org, revealed a screenshot of slot machine type gaming as below:





35.     According to the website, the software is provided through the "PlayNet Island Portal" where users (café customers) can locate gaming products.  It adds that each area, or theme, can be customized by the operator to provide for the users' needs.  SweepsCoach utilizes the customization service and has their name emblazoned on the site in the PlayNet Island Portal for their users.

36.     In a review of financial records, SweepsCoach Entities transferred a total of $5,071,084 to Hurrington Group, KFT from January 1, 2012 to July 31, 2017.

### E.  The Involved Entities

37.     MECHAM, STOCKS and EDWARDS established numerous business identities which acted as the lead company and the face of the gaming operations during different periods of time.  Once established, the entities opened bank accounts to directly receive gaming proceeds.  Although MECHAM initially organized the businesses as sole proprietorships by filing documentation with his county using his home address, later in the scheme, the entities were arranged as corporations.  The first corporation used by MECHAM was Abnom, Inc., registered in California by MECHAM in 2011.  In 2015, MECHAM, STOCKS, EDWARDS and others began establishing corporations in several states using an "asset preservation service" company called Magenta Corporate Services ("Magenta") in Nevada and Castle Corporate Services ("Castle") in Wyoming.  Magenta's website offers assistance in: 1) setting up a Nevada corporation, 2) providing a Nevada Registered Agent of Service, 3) establishing a physical office address as proof of residence for state tax purposes, 4) arranging mail forwarding service and an 4) office style telephone service.  Registered Agents at Magenta and Castle assisted MECHAM, STOCKS and EDWARDS to establish corporations in Nevada and Wyoming.

### i.     "The SweepsCoach Entities"

38.     The SweepsCoach Entities consist of Abnom, Stuff About Games, SweepsCoach and Burkiworks, and are further detailed below:

i.  *__Abnom__* was registered as a Fictitious Business Name with Placer County, California

by MECHAM in a "Doing Business As" ("DBA") arrangement in Roseville,

California in at least December of 2003.

ii.  *__Stuff About Games__* appears to have been created at the same time as Abnom as

another DBA for MECHAM.

iii.  *__Abnom, Inc.__* was incorporated in the State of California on April 4, 2011 at 877

Embarcadero Drive, Suite 1, El Dorado Hills, California (SUBJECT BUSINESS

PREMISES- SITE 1) listing MECHAM as the registered agent and President of the

company.  MECHAM filed a Certificate of Dissolution for the corporation on July 18,

2016.

iv.  *__SweepsCoach__* was established as a DBA with El Dorado County on July 12, 2011 with

MECHAM as the president.  MECHAM registered the business address as 3052

Lennox Drive, El Dorado Hills, California, which was a home rented by MECHAM

and 877 Embarcadero Drive, El Dorado Hills, California (SUBJECT BUSINESS

PREMISES- SITE 1).  Incorporation documents for SweepsCoach have not yet been

identified at this time.  The DBA registration expired on July 12, 2016.

v.  *__Burkiworks, Inc.__* was originally incorporated in the State of Nevada on August 16,

2005, unaffiliated with any of the SweepsCoach Entities or persons at that time.  On

August 18, 2015, the articles of incorporation were amended, replacing the prior

director of the corporation with Kurt Stocks.  The business is currently registered in

good standing with the State of Nevada.

**ii.**   **Entities Created Solely to Receive Gambling Monies**

39.     As discussed above, entities were established for MECHAM, STOCKS and EDWARDS created to "do business" with the SweepsCoach Entities.  Rather than have the SweepsCoach entities make payments directly to MECHAM, STOCKS and EDWARDS, each person first established a corporation with the assistance of Magenta or Castle, and then opened bank accounts held under the newly created identities. Below is a more complete explanation of those entities and the bank accounts under their control:

    i.    **_Lemon Gold Ventures, Inc._** was incorporated in the State of Nevada on October 23, 2015 with Magenta as the Registered Agent of Service. On June 10, 2016, the articles of incorporation were amended but were not available online.  EDWARDS has opened bank accounts claiming to be the Vice President of Lemon Gold Ventures, Inc.

    ii.    **_Baboon Productions, Inc._** was incorporated in the State of Nevada on June 1, 2015 with Magenta as the Registered Agent of Service.  MECHAM has opened a bank account claiming to be the Vice President of Finance for Baboon Productions, Inc.

    iii.    **_Black Rock Investments._** was incorporated in the State of Wyoming on September 8, 2015 with Castle as the Registered Agent of Service and MECHAM as the Director.

    iv.    **_Lakeview Technology Association, Inc._** was incorporated in the State of Wyoming on October 13, 2015 with Castle as the Registered Agent of Service.  MECHAM has opened a bank account by providing the Articles of Incorporation and signing as an "authorized person" for Lakeview Technology Association, Inc.

    v.    **_Oakridge Management Group_** is arranged in unknown manner at this time. Commercial databases did not reveal business or incorporation filings in the states of California, Wyoming or Nevada.  MECHAM opened a bank account as the owner of "Oakridge Management Group."

vi. ***Madrone Ventures, Inc.*** was incorporated in the State of Nevada on June 1, 2015 with Magenta as the Registered Agent of Service and MECHAM as the Director.

vii. ***Phoenician Holdings, LP*** was established as a limited partnership in the State of Nevada on October 4, 2013 with Magenta as the Registered Agent of Service. MECHAM and his wife, Jenny Mecham, are listed as partners.

viii. ***Redwood Ventures, Inc.*** was incorporated in the State of Nevada on October 4, 2013 with Magenta as the Registered Agent of Service and MECHAM as the Director.

ix. ***Coyote Ridge Outfitters, Inc.*** was incorporated in the State of California on August 18, 2015 with Caspian Corporate Services as the Registered Agent of Service and MECHAM as the Incorporator.  MECHAM has opened a bank account by providing the Articles of Incorporation of Coyote Ridge Outfitters, Inc. and claiming the title of President.

x. ***Pacific Ridge Management, Inc.*** was incorporated in the State of Nevada on January 14, 2013 with Magenta as the Registered Agent of Service.  MECHAM has opened a bank account under the entity claiming the title of "VP of Marketing."

xi. ***Santara Technology Solutions, Inc.*** was incorporated in the State of Nevada on October 23, 2015 with Magenta as the Registered Agent of Service.  STOCKS opened a bank account under the entity claiming the title of "Vice President."

xii. ***Sierra Executive Group, Inc.*** was incorporated in the State of California on October 1, 2015 with Caspian Corporate Services as the Registered Agent of Service listing the business address of 877 Embarcadero Drive, El Dorado Hills, California (SUBJECT BUSINESS PREMISES- SITE 1).  STOCKS is identified as an "Executive" in the incorporation and has opened a bank account as the authorized signor.

xiii.  ***Washington Sinclair Technologies, Inc.*** is arranged in unknown manner at this time. Commercial databases did not reveal business or incorporation filings in the states of California, Wyoming or Nevada.  However, EDWARDS opened a bank account and has signing authority for the Washington Sinclair Technologies, Inc. account.

xiv.  ***Cameo Holdings, Inc.*** was incorporated in the State of Wyoming on October 29, 2015 with Castle as the Registered Agent of Service.  EDWARDS has opened a bank account as an owner with sole signing authority over the account for Cameo Holdings, Inc.

## F.  Law Enforcement Operations- California

40.     The following information was gathered by federal, state and local law enforcement agencies and provided for this affidavit by Special Agent Adrian Retiz of the BGC.  Special Agent Retiz coordinated with local law enforcement throughout the State of California and found that the SweepsCoach Entities operation was consistent from location-to-location.  The information below was obtained from his contacts with local law enforcement who encountered SweepsCoach sourced internet cafes and from his own interaction with SweepsCoach café clients and operators.  During the time period of this investigation from January 2012 through current, at least ten SweepsCoach Entities locations and devices that have been observed and described in the remainder of this affidavit, operated in a similar manner to the described below:

i.  Upon entering the internet café, customers are greeted by a cashier, load their player identification number with gambling credits and could take a seat at any open station. Some locations have additional employees act as security which was less common in a legitimate internet café business front.  At some café locations, wall graphics depicted gaming such as slot machine reels or fruit icons, or disclaimers stating that the

operation is not a gambling establishment.  Internet gaming cafés are more permissible of having speakers play gambling tones such as spinning reels, bells or simulated coins dropping into a bin when signifying a win.  In legitimate internet cafés, the excessive background noise would be annoying to most patrons but in a gaming café, the bells and coins are considered an exciting part of the activity.  The following image taken after a law enforcement operation depicts one of the illegal café locations described in this affidavit:



ii.    In order to play a game at a kiosk, a player must inform a store employee of the desire to play and establish or contribute money to an account.  The user first must open an account with an identification document and a password and then pay a cashier with U.S. currency for the amount they wish to gamble/play.  This is the phase in which internet cafés allege patrons are only purchasing internet time.  A customer will generally pay one (1) cent per one (1) unit.  For example if you purchase $20 of internet time, this will equal to two thousand (2000) units.  Once a customer has

obtained their logon, the game performs much like a slot machine game in Las Vegas and/or a Tribal Indian casino.  The game requires a minimum bet for each betting line and allows a customer to control betting amounts which will change the result if the player wins.  Every line selected will increase the cost from one (1) cent to fifty (50) cents depending on the game. The game features an icon or "button" which must be clicked by a computer mouse causing the reels to spin, generally is referred to as the "REVEAL" button.  The objective of the game, just like a slot machine in Las Vegas, is to match a series of symbols, such as three (3) SEVENS.

iii.   Once seated at a terminal, internet café patrons often are presented with a choice of available games to suit their taste.  Below is a screenshot example of the SweepsCoach Entities game choices taken during a search by law enforcement:



Page 23  AFFIDAVIT OF Jason E. Lamb

iv.   Although not easy to read, but visible at the top of the image above, circled for identification, is the web address to which this computer is connected.  The address states: www.playnetisland.com, which is the web portal provided by Hurrington Group, KFT as discussed in an earlier section.  The games provided are common games provided by Hurrington Group, KFT, the web page featured above has been customized to SweepsCoach Entities specifications.

v.   The account and play is established and tracked through a server operated, monitored and/or controlled by the SweepsCoach Entities.  The player logs into the gaming terminal using the code or login.  After logging in, the player spends the provided credits and either wins or loses the game.  These games have scrolling sets of columns/wheels, similar to those seen at slot machines at casinos.  As with a slot machine using a player card in Las Vegas, the SweepsCoach Entities systems also stores winnings or deducts losses from the account without a coin payout.  The player identity card allows the customer to use credits loaded onto the account by a cashier, play winnings generated and added to the account or go to the cashier to redeem funds.  An example of these choices by the patron on a SweepsCoach system is depicted below in a screenshot taken during a law enforcement operation.  The "Redeem" screen allows a customer to load their winnings onto their playable credit account or allows them to "Redeem & Print" which states that it "Prints you a ticket for redeeming your winnings at the desk."



41.     SA Retiz reports that SweepsCoach first came to the attention of the BGC during routine enforcement contacts on internet gaming cafés.  While performing inspections, owners and employees of cafés began to identify SweepsCoach as at least one of their gaming software providers.  Below is a summary of these contacts, undercover operations and enforcement operations:

          **i.**      **(Search Warrant #1)  Funsweeps- 2902 Auburn Blvd, Sacramento, CA- February 14, 2013**

42.     On February 14, 2013, the BGC assisted the Sacramento County Sheriff's Department in serving a search warrant for an internet café known as Funsweeps located at 2902 Auburn Blvd, Sacramento, California. The search warrant was a result of undercover operations which confirmed illegal gambling was occurring on the premises. During the search warrant, BGC agents interviewed the cashier and also the computer technician of Funsweeps and were told that SweepsCoach, SweepsCoach Extreme and Izone were the software providers for their online games.

          **ii.**     **(Undercover Operation #1)  Bullseye Internet Café- 402 Colusa Avenue, Yuba City, CA- March 7, 2013**

43.     On March 7, 2013, a BGC special agent conducted an undercover operation at Bullseye Internet Café and found that SweepsCoach was one of the software providers being used.

### iii.     (Undercover Operation #2)  Biz Max Internet- 5581 Hillsdale Blvd, Sacramento, CA- October 10, 2013

44.     On October 10, 2013, a BGC special agent conducted an undercover operation at Biz Max Internet and was asked if he wanted to play "SweepsCoach" or "SweepsCoach Extreme" games and was asked to fill out a SweepsCoach player's card.

### iv.     (Undercover Operation #3)  Net Zone- 6825 Stockton Blvd, Sacramento, CA- March 26, 2014

45.     On March 26, 2014, a BGC special agent conducted an undercover operation at Netzone and determined that SweepsCoach was the software being used.

### v.     (Search Warrant #2)  Mi Expresso Café- 1017 Bear Mountain Blvd, Arvin, CA- March 11, 2016

46.     BGC received information from a confidential source regarding the existence of an illegal gambling establishment known as Mi Expresso Café (MEC), located at 1017 Bear Mountain Boulevard in Arvin, CA and operated by Gabriela GONZALEZ ("GONZALEZ.")

47.     On March 10, 2016, an undercover operation was conducted at Mi Expresso Café by agents of the BGC.  The special agent ("UC1") observed the following:

      i.     The business had approximately ten (10) computers along the north wall of the business on four tables. The UC1 agent approached the cashier, later identified as Raudel Aguayo VILLARREAL ("VILLARREAL.")

      ii.     When asked about the computers, VILLARREAL told UC1 that she needed to first open up an account. VILLARREAL began typing into his computer and asked UC1 for her name and a 4 digit personal identification number (PIN) for her log in.

    iii.    UC1 handed VILLARREAL $20.00 and asked to play $10.00.   UC1 sat down and the log in screen came up on the computer.  UC1 entered her four digit log in password into the computer and the main menu appeared giving her the option to play numerous different slot style games.  VILLARREAL approached UC1 and illustrated how to play one of the games and explained that you press the "play" button (option) and the reels spin. During this spin game, the customer plays the middle line and the objective is to get three of the same symbols match on the line.  When the reels stop spinning, the customer has the option to select to move one of the reels in the game to get a third symbol match.  VILLARREAL referred to this portion of the game as the "skill" portion and he said this is the reason they are "legal" to play.  UC1 played and lost all credits before leaving.

48.    Later on the same day, a second special agent acting in an undercover capacity ("UC2") entered MEC.  VILLARREAL was still the cashier and provided UC2 with $20.00 worth of credits. VILLARREAL told UC2 that (of the 10 computers), the "skill" computers were on the right hand side and the "old computers" were on the left.  According to VILLARREAL, the games UC2 was playing were similar to the games at the far end (designated as SWEEPSCOACH gaming system computers) except the players have to be "more involved in the game."  VILLARREAL told UC2 that you need to "finalize the game" to collect the win.  VILLARREAL went on to explain that there were multiple activities going on in the game: in addition to pushing the play button where the reel spins, you have a grid shaped object in the upper left and right corners of the screen.  At any given moment the grid shaped object can turn green or red. When it/they turn green the customer is supposed to click the green which gives the customer the ability to "win."  VILLARREAL told UC2 if you get a red grid shaped object, it would be considered "a loss." VILLARREAL stated because of the choice of the red and the green grid shaped object, this makes the game

a "skill" game.  VILLARREAL then showed UC2 a second interface game where the customer can move each of the slot dials up or down, a total of one or two times, to acquire a three symbol match.  At one point, VILLARREAL pointed at the screen and said: "So it shows where you're betting."

49.     When UC2 logged off to cash out, he went to look at the computers which VILLARRAL had indicated were "old computers" that did not require skill.  UC2 saw "SWEEPSCOACH" on the upper left corner of one of the computer screens.   UC2 asked VILLARREAL what the difference was with one of the other games (referring to the older computers to the left of which UC2 had been using) and VILLARREAL said, "Same game, same process," but the player is not as involved.  He said you just "hit" and see what happens…"They call it a chance game." "They consider that gambling."

50.     On March 11, 2016, BGC agents served a search warrant at MEC.  Inside the building the agents located GONZALEZ, who jointly owned the business with VILLARREAL, who arrived during the search.

51.     GONZALEZ stated she was the original owner of MEC since about February  2013.  VILLARREAL later became a joint owner of the business.  After they opened, they were visited by a sales representative from SweepsCoach named "Mike."  GONZALEZ said Mike took VILLARREAL and her to another local location so they could see how to run an internet café.  GONZALEZ said they were given the option to purchase computers from SweepsCoach or they could purchase their own and SweepsCoach would provide the software.

52.     GONZALEZ said they bought their own computers and started with twenty (20) stations programmed by "Mike."  GONZALEZ said they agreed to pay SweepsCoach 25% of their profit but generally purchased from SweepsCoach 1,000 points for $250; which included the 25% that they agreed to pay.  They then sold the points to their customers to use on the games.

53.     GONZALEZ stated sometime on November 2015, they were contacted by a new sales representative from SweepsCoach by the name of "Mark."  Mark said that SweepsCoach was offering new games with a skill aspect, which made the games legal.  Mark came to MEC and installed the new software on their computers and provided new rules of the games.  Mark informed them about a court case out of Bakersfield, which made SweepsCoach games legal because they were skilled games as the customer determines the outcome of the game.

54.     Agents of the BGC documented the computers through screenshots showing that the terminals were accessing SweepsCoach gaming software:



      **vi.**     **(Inspection and Search Warrant #3)  Dang Cafe- 13100 Magnolia Ave, Corona, CA- November 10, 2016 and March 16, 2017**

55.     In August of 2016, the BGC had received a phone complaint of an illegal gambling operation called Café Dang located at 13100 Magnolia Avenue, Corona, California.  The complaint alleged that the location is overtaken by gangs at night.  The complainant claimed this place has been in business for over a year and was very busy.  The complainant stated she believed it was SweepsCoach that was displayed on the computer screens.

56.     On November 10, 2016, BGC agents visited Café Dang and found four patrons playing on computers determined to be illegal gaming devices.  The only onsite employee was Kahlil DIB ("DIB.") Several patrons were interviewed and relayed the following:

        a.   One customer said that he knew the café gaming was illegal but the tribal casino was too far to visit.  He added that he has won approximately $2,500 dollars at one time and was paid in 2 payments.

        b.   A second patron said he has won up to approximately $600 but has lost a couple of thousand dollars.  When redeeming his winnings, he is paid in cash.

57.     When interviewed, DIB at first stated that this was not gambling and insisted they were predetermined games and not gambling.  DIB, however, admitted that people were coming to this business to gamble.  DIB stated that the computers at Dang Café bore a banner with "SweepsCoach" on them.

58.     During the contact, SA Retiz observed numerous computers with the screen lit with a banner at the bottom of the screen: "Games Created By SweepsCoach, WWW.Sweepscoach.com."

59.     After learning that the Dang Café had reopened after this initial inspection, a search warrant was executed on March 16, 2017 by the Riverside County Sheriff's Department with the assistance of BGC agents.

60.     SA Retiz was present during the search and re-contacted DIB.  DIB said the owner of the business was the "company."  DIB explained that the "company" meant it was owned by SweepsCoach. DIB said a person by the name of "GRIER," who is a Manager for SweepsCoach, hired him.  DIB further stated he heard from GRIER that the owner of SweepsCoach was "JAMES" and the company was somewhere in the Sacramento area.  DIB pointed out that the computers displayed on the table belonged to SweepsCoach.

61.     SA Retiz asked DIB if he was instructed on what to say if the police came to the business. GRIER instructed him that if asked, he would say only that when a customer comes to their business he will open an account for the patron. GRIER told him customers will buy their time to access to the computer and what they do on the computer is not their business.

62.     During the search warrant, the BGC agents examined the computers and found they were operating and SweepsCoach branded software through the [playnetisland.com](http://playnetisland.com) web connection to offshore software gaming provider Hurrington Group, KFT associated to SweepsCoach as below:





Page 31  AFFIDAVIT OF Jason E. Lamb

**vii.     (Search Warrant #4)  Netzone Internet Café and Business Center- 9915 S. Union Avenue, Bakersfield, CA- July 26, 2017**

63.     On March 21, 2017, BGC agents visited Netzone Internet Café and Business Center (NICBC). at 9915 S. Union, Bakersfield, California and found that the windows were covered with cardboard preventing the general public from viewing the inside of the business.  Inside, BGC agents observed a cashier sitting inside a room with a customer window and video surveillance cameras attached to the ceiling. Several computers were operating which displayed: "Web-based PromoTek Sweepstakes Games-Created by SweepsCoach" www.sweepscoach."

64.     On July 26, 2017, BGC agents and the Kern County Sheriff's Department served a search warrant at the business.  The cashier, who was later identified as Ghassan ABOUIED ("ABOUIED"), was inside the cashier's room.  Found inside the business were documents which included:

- Commercial Net Lease for part of building which was under the name of Louis Afram GREIR. {GREIR was associated with Dang Café and identified as a representative of SweepsCoach} The lease was for the period of March 2016 to March 2017.
- A SweepsCoach player card which contained their password and user name. The card displayed the website: www.revealmyentries.com and the name SweepsCoach.
- Receipts were also seized indicating how much players had won.

65.     ABOUIED was interviewed by SA Retiz onsite.  ABOUIED indicated that he knew little of SweepsCoach other than it was the name displayed on the computers and on the cards which he completes for the patrons with their computer identification and password.

### G.  Law Enforcement Operations- Arizona

**i.     (Inspection) Elbow Room- 1145 W. Prince Road, Tucson, AZ- November 18, 2015**

66.     On November 18, 2015, agents from the Arizona Department of Gaming visited the Elbow Room bar located at 1145 W. Prince Road, Tucson, Arizona based on a customer complaint. The bartender, Sheila Ann HANSON ("HANSON"), showed the machines to the agents.  HANSON identified more than 30

games available to play and indicated that she would collect funds from patrons and would pay out any winnings. HANSON displayed to the agents how the amount of the wager could be changed by the customer just like a slot machine in Las Vegas. When asked if she considered the use of the device as gambling, she responded: "yes." HANSON said the largest amount won by any customer in a jackpot was $2,000 and they were paid $150 from the cash register and the bar owner made other arrangements to pay the balance. HANSON did not know who owned the kiosk computers but a person named: "Mike" from California was their contact when they had a problem with the machines.[3] The Arizona gaming agents seized the machines as illegal gaming devices under Arizona Revised Section 13-3306.

### H. Ongoing and Current Criminal Activity of the SweepsCoach Entities

67.    As will be discussed in further detail during the Summary of Pertinent Financial Analysis section of this affidavit, the SweepsCoach Entities have had the bulk of their gaming business shift to the illegal proceeds generating internet cafés of California and Arizona. In an examination of deposits by state beginning in 2012 through July of 2017, the proportion of proceeds obtained from California based internet cafés has steadily increased. In 2012, California and Arizona originated gaming proceeds accounted for about 50% of all gaming deposits. By 2014, that number had risen to approximately 75% of deposits sourced in California and Arizona. In 2015 through the most recent set of full banking records received for July of 2017, the percentage of funds received from California based clients is at least 89%. It should be noted that a full tracing for 2016 and 2017 credit card processed payments was not available at the drafting of this affidavit and thus the funds were treated as sourced from an unknown customer and counted as clean funds. If a credit card analysis had been possible and based on an analysis completed during an earlier

---

[3] "Mike" was later identified as Michael Dorsch of Poway, California by the Arizona gaming agents and can be found in numerous banking surveillance photographs in Arizona and California depositing cash into SweepsCoach Entity's bank accounts. Michael Dorsch is believed to be the same person who represented himself as a sales representative of SweepsCoach to Gabriella Gonzalez at Mi Expresso Café in Arvin, CA.

period, the percentage of California based customers using the credit processing system would approximate the overall percentage of deposits made directly at branches throughout the United States. It is expected once this analysis has been completed that California sourced funds will account for well over 90% of the SweepsCoach Entities business through the current analyzed period of July 31, 2017.

68.     During the course of this investigation, I have been contacted by anti-money laundering officials at numerous banks where the SweepsCoach Entities conduct business. Due to the large volume of cash being deposited at branches across the United States and the behavior of the depositors, the banks were concerned as to the source of the funds and the purpose of the business. In communication with these officials, I have discovered that the business activity is still ongoing after the period of available bank records available to me through July 31, 2017. In addition, some bank officials has contacted me regarding the activities of not just the SweepsCoach Entities accounts but also of the accounts under the name of identities owned and controlled by MECHAM, STOCKS and EDWARDS.

69.     In a recent exchange with El Dorado Savings Bank in September of 2017, the bank informed me that they had a concern regarding their client, EDWARDS. The bank advised that an entity under the control of EDWARDS was receiving funds from another entity into her El Dorado Savings Bank account, then funneling the funds to another entity at a different bank. In an examination of the checks received at their institution, they found that EDWARDS was the signor on the issued checks deposited at their bank as well as being the recipient. The bank was concerned as to what business EDWARDS was actually involved where she could make a payment and collect a payment on services rendered. On September 8, 2017, a branch manager of El Dorado Savings Bank contacted EDWARDS while she was at a branch about a recent transaction where she issued funds and received funds on behalf of two different entities and their purpose. EDWARDS explained to the office that she worked for both companies and had done consulting for each. She claimed that although she was only a consultant for one of the companies, she had been given signing

authority over the account as well.  The manager observed that EDWARDS became very defensive during

the discussion and abruptly left the bank.  After leaving the branch, EDWARDS later phoned the manager

and apologized for having a "short temper."  She admitted that she was not just a consultant but an officer of

both entities.  She claimed that she was in the business of assisting convenience stores in the purchase of

computers and advises them how to run the systems.  The consulting fees she received were for

reimbursement for out of pocket expenses for computer equipment.  The bank examined her account and

found what only appeared to be personal expenses purchased through the use of her debit card which did not

support her claim and issued a letter notifying her that the account would be closed.

## VI.   PROBABLE CAUSE REGARDING SPECIFIC LOCATIONS

### A. 877 Embarcadero Drive, Suite 1, El Dorado Hills, California and connected storage area

70.     MECHAM and through extension, SweepsCoach, initially had not concealed the physical

business location.  When SweepsCoach was the primary operating gaming business entity, MECHAM

registered as the owner, acted as the spokesman for the business, listed his home address on some

governmental filings, and listed the business address as 877 Embarcadero Drive, Suite 1, El Dorado Hills,

California (SUBJECT BUSINESS PREMISES- SITE 1.)

71.     Although the address of SUBJECT BUSINESS PREMISES- SITE 1 was used in

governmental filings and bank account openings, since at least 2015, the physical suite location was never

marked with a sign to identify the business occupant and the blinds were usually drawn concealing the inside

of the premises.  Even though the blinds were drawn and the business did not appear open to business,

vehicles for the owners and employees of the business were seen parked at the building.  In 2015 through

2016, surveillance showed MECHAM, STOCKS and EDWARDS frequently spent their days at the

SUBJECT BUSINESS PREMISES- SITE 1.

72.     During the transition when Burkiworks replaced SweepsCoach in late 2015, little changed in the operation other than customers depositing checks directly into Burkiworks titled accounts rather than SweepsCoach accounts, many writing "SweepsCoach" on deposit slips not understanding why the business had changed names.  Even with the transition to Burkiworks as the lead entity, the gaming software continued to bear the "SweepsCoach" name that clients recognized.  One additional change occurred at the time Burkiworks became the face of the gaming operation: the business address was changed from 877 Embarcadero Drive, Suite 1, El Dorado Hills, California to 212 Elks Point Road in Zephyr Cove, Nevada.

73.     On May 10, 2017, I found that the Zephyr Cove, Nevada address was the address for the United State Post Office.  The Post Master explained that they do not provide residential delivery in Zephyr Cove.  Instead, residents of Zephyr Cove are permitted a free post office box or can have their mail held for pick-up as rural delivery.  In order to be an established Zephyr Cove resident and receive mail, the person or entity must have a physical address in the area.  The Post Master accessed their system and reported that the physical address associated to Burkiworks is 310 Dorla Ct, Suite 202, Zephyr Cove and that the mail box was opened in November of 2016 by STOCKS.  As mail must be picked up at the counter, a mail clerk who operates the front counter and deals with all of the local residents added that he has only seen the box holder (STOCKS) a couple of times and usually the mail is picked by a female although the volume of mail received is light.

74.     I drove to the address provided to the post office as the Burkiworks business location, 310 Dorla Ct., Suite 202, Zephyr Cove, Nevada.  The suite was unmarked as to business but did bear the "202" number.  After receiving no answer from knocking on suite, I exited the building and walked behind the building to a common area and was able to determine that suite 202 consisted of one room with the only furnishings being 2 desks, a couple of chairs and a small five drawer file cabinet.  Neither desk appeared to

be frequently used as each had computer peripherals on top and around, some connected and some disconnected.

75.     Although Burkiworks was listing Zephyr Cove, Nevada as the official address for the business, several hours later on the same day that I visited Zephyr Cove, I found that vehicles for EDWARDS and STOCKS were parked directly in front of SUBJECT BUSINESS PREMISES- SITE 1.

76.     Furthermore, on numerous occasions beginning in October of 2015 through October of 2017, between 9AM and 6PM, vehicles registered to MECHAM, STOCKS and EDWARDS have been identified parked in front of SUBJECT BUSINESS PREMISES- SITE 1.  Sporadic surveillance has been conducted on the SUBJECT BUSINESS PREMISES- SITE 1 beginning in 2015 through 2017 with specific recent instances highlighted below:

        i.     On September 6, 2017, STOCKS was seen arriving at SUBJECT BUSINESS PREMISES- SITE 1, unlocking the door and entering.  Approximately 2 hours later, MECHAM exited 895 Embarcadero Drive, Suite 104, El Dorado Hills, California, collected Federal Express delivery notices from the door, locked the door and entered SUBJECT BUSINESS PREMISES- SITE 1, without knocking through an unlocked door.  STOCKS and MECHAM then exited SUBJECT BUSINESS PREMISES- SITE 1, after locking the door and went to lunch.

        ii.    On October 3, 2017, I viewed STOCKS park next to a dumpster on the side of the SUBJECT BUSINESS PREMISES- SITE 1 and enter the business carrying a bundle of papers.  STOCKS remained in the business for more than an hour leaving the front door open while inside.  Visible through the open door was a hallway and furniture.  STOCKS was not visible through the open door as he was in one of the offices for the duration.

Page 37  AFFIDAVIT OF Jason E. Lamb

iii.    On October 18, 2017, agents of the BGC viewed STOCKS arrive at the SUBJECT BUSINESS PREMISES- SITE 1, unlock the door and enter. Shortly thereafter, STOCKS exited the business and met with MECHAM in the parking lot where he was handed a small package which appeared to be wrapped in black material. STOCKS returned to the business, left the package inside and departed the business, locking it behind him.

77.    Searches of refuse placed into the business complex dumpster have uncovered limited items including mail addressed to MECHAM at the location. The only item associated to gaming found was addressed to STOCKS:

i.    November 10, 2015- letter from the Amusement Expo International 2016 addressed to "Kurt Stocks/SweepsCoach;"

78.    877 Embarcadero Drive, El Dorado Hills, California consists of a building with 2 suites on the top level marked "1" and "2" at street level and one suite marked "3" on the underside of the building to the right. There is a separate storage area with its own door, unmarked by suite number, just to the right of Suite 1. This extra office space appears to be connected to the SweepsCoach operation. In fact, when rent is paid on Suite 1 to the property owner each month, a second check is issued at the same time which identifies: "Suite 2" or "storage space" which is paid at a reduced rate than a full suite price. I believe that this unmarked door to the immediate right of Suite 1 is the space which is additionally rented and that the actual Suite 2, is and was not rented by the SweepsCoach entities. Currently, Suite 2 on the upper level of the building is vacant and all blinds have been opened to show that it is empty. In contrast, Suite 1 and the outside accessible storage space next to Suite 1 have metal blinds drawn and closed. On August 22, 2017, I walked up to the storage space and saw what appeared to be a slot machine style gaming placard on the window sill under the closed blinds which is depicted below:

Page 38  AFFIDAVIT OF Jason E. Lamb



### B.  895 Embarcadero Drive, Suite 104, El Dorado Hills, California

79.      Beginning in at least January of 2016, MECHAM began issuing payments from an account held under Coyote Ridge Outfitters to rent office suite #104 located at 895 Embarcadero Drive, El Dorado Hills, CA (SUBJECT BUSINESS PREMISES- SITE 2.)  MECHAM has since that time continued to make monthly payments on this office suite.  The office suite is located in the same parking lot at the SweepsCoach/Burkiworks office in a separate building.  The suite is unmarked as to business name and keeps the blinds closed most of the time.  In the last year, MECHAM has primarily worked out of this location rather than the suite at SUBJECT BUSINESS PREMISES-SITE 1 while still being the beneficiary of large and frequent payments from the gaming proceeds associated to the SweepsCoach Entities.

80.      Sporadic surveillance has been conducted in 2017 on the SUBJECT BUSINESS PREMISES-SITE 2 since it was discovered through surveillance.  Each time MECHAM has been seen entering or leaving the location, he is seen locking the door.  No other persons have been seen entering SUBJECT

BUSINESS PREMISES- SITE 2 during surveillance other than STOCKS and MECHAM's spouse. Specific instances of surveillance are highlighted below:

     i.    On September 6, 2017, STOCKS was seen arriving at SUBJECT BUSINESS PREMISES- SITE 1, unlocking the door and entering. Approximately 2 hours later, MECHAM exited SUBJECT BUSINESS PREMISES- SITE 2, collected Federal Express delivery notices from the door, locked the door and entered SUBJECT BUSINESS PREMISES- SITE 1, without knocking through an unlocked door. STOCKS and MECHAM then exited SUBJECT BUSINESS PREMISES- SITE 1, after locking the door and went to lunch. STOCKS dropped MECHAM off at his vehicle MECHAM and visited Federal Express before returning to SUBJECT BUSINESS PREMISES- SITE 2, again unlocking the door.

     ii.    On October 16, 2017, STOCKS was seen arriving at the SUBJECT BUSINESS PREMISES- SITE 2, met MECHAM at the door and entered the business. Shortly thereafter, STOCKS and MECHAM exited the business and stood in front of the building and seem to point at a surveillance camera mounted in front Suite 104 while looking at a document.

81.    In the course of this investigation, trash has been collected from several of the locations to collect evidence and/or identify fruits of the proceeds received in the operation of the SweepsCoach Entities. A search of the garbage left on the curb in front of 2489 Highland Hills Drive, El Dorado Hills, California on October 20, 2017 revealed the following:

     a.    A notice from Provo City Utilities, 351 West Center Street, Provo, UT dated August 27, 2017 and addressed to Jenny Mecham at 895 Embarcadero Dr, Ste 104, El Dorado Hills, CA. (SUBJECT BUSINESS

PREMISES- SITE 2)  The letter was marked "Final Notice" regarding

past due utility services for at 321 N 600 E, Provo, Utah.

82.     Although the notice was discovered in the trash at 2489 Highland Hills Drive, El Dorado

Hills, California, it had clearly been delivered to and received the SUBJECT BUSINESS PREMISES- SITE

2.  The letter from the municipality addresses a past due tax bill which is associated to a property owned by

Liberty Enterprises UT, LLC, an entity created and controlled by MECHAM's spouse, Jenny Mecham.

### C.  5110 Steves Way, El Dorado Hills, California

83.     STOCKS rents the residence located at 5110 Steves Way, El Dorado California

(SUBJECT RESIDENCE- SITE 3) and has resided at the location since at least 2012, covering all periods of

this investigation.  On numerous occasions as discussed above, STOCKS has been seen driving between his

home and the business location at 877 Embarcadero, Suite 1, El Dorado Hills, California (SUBJECT

BUSINESS PREMISES- SITE 1).

84.     While limited surveillance was conducted the SUBJECT RESIDENCE- SITE 3, surveillance

from the SUBJECT BUSINESS PREMISES- SITE 1 often led teams to the residences of STOCKS and

MECHAM.  Specific instances of surveillance are highlighted below:

      i.     On October 3, 2017, STOCKS was seen arriving at SUBJECT BUSINESS

PREMISES- SITE 1 and parking his truck on the side of the business.  STOCKS

exited the vehicle carrying a bundle of papers and took them into the SUBJECT

BUSINESS PREMISES- SITE 1 and remained inside for more than an hour.

STOCKS later returned to SUBJECT RESIDENCE- SITE 3.

     ii.     On October 18, 2017, STOCKS departed SUBJECT PREMISES- SITE 3 in his truck

and visited a Pak Mail location, carrying white envelopes into the business.  STOCKS

returned to the SUBJECT PREMISES- SITE 3 after mailing the letters.

### D.  2489 Highland Hills Drive, El Dorado Hills, California

85.     MECHAM and his wife purchased 2489 Highland Hills Drive, El Dorado Hills, California (SUBJECT RESIDENCE- SITE 4) in January of 2016.  As with STOCKS, MECHAM has been seen driving between his home and the business location at 877 Embarcadero, Suite 1, El Dorado Hills, California (SUBJECT BUSINESS PREMISES- SITE 1), and in the recent months, to 895 Embarcadero, Suite 104, El Dorado Hills, California (SUBJECT BUSINESS PREMISES- SITE 2).

86.     Periodic surveillance has been conducted in 2017 on the SUBJECT RESIDENCE- SITE 4 included trailing MECHAM between his home and SUBJECT BUSINESS PREMISES- SITE-2.  Specific instances of surveillance are highlighted below:

        i.     On October 18, 2017, MECHAM and his wife departed the SUBJECT RESIDENCE- SITE 4 and were seen at the SUBJECT BUSINESS PREMISES- SITE 2.  While at the business, MECHAM and his wife walked towards SUBJECT BUSINESS PREMISES- SITE 1, meeting STOCKS in front of a bar in the parking lot where they handed him a small package wrapped in black material.  STOCKS took the package into SUBJECT BUSINESS PREMISES- SITE 1 and left the item inside.  After lunch with his wife, MECHAM stopped at First Citizens Bank in Folsom, California (Note: this branch holds a bank account under an entity by the name of Black Rock Investments, Inc., discussed earlier in this affidavit with a financial analysis presented later in the affidavit.)  MECHAM and his wife visited a daycare facility and returned back to SUBJECT RESIDENCE- SITE 4).

87.     A search of the garbage left on the curb in front of 2489 Highland Hills Drive, El Dorado Hills, California on October 20, 2017 revealed the following:

a. A notice from Provo City Utilities, 351 West Center Street, Provo, UT dated August 27, 2017 and addressed to Jenny Mecham at 895 Embarcadero Dr, Ste 104, El Dorado Hills, CA.  The letter was marked "Final Notice" regarding past due utility services for at 321 N 600 E, Provo, Utah.

b. Two (2) letters from PHH Mortgage addressed to James Mecham at 2489 Highland Hills Drive, El Dorado Hills, CA regarding mortgage loan offers.  The letters included current mortgage loan partial account numbers, current balances and current interest rates.  The loans referenced in the offers were:

    i. "Your Loan Number XXXXX16317"; "Current Mortgage Balance of $145,071": and "Current Interest Rate of 4.375%."

    ii. "Your Loan Number XXXXX61864"; "Current Mortgage Balance of $184,619": and "Current Interest Rate of 4.750%."

## VII.   TRAINING AND EXPERIENCE RELATED TO GAMBLING SEIZURES

88.    Based upon my training and experience, my discussions with other law enforcement agents involved in this case that have experience in gambling investigations, and interviews of persons with knowledge about the matters described herein, the following traits are common practices of those persons involved in illegal video gambling production, sales, and maintenance.

89.    Owners of illegal gambling businesses, including video gaming machine operators, keep extensive records of their illegal business activity, including, but not limited to, records of the locations where their machines are located and the profits associated with the machines, along with records of the

expenses associated with the illegal gambling activity.  More likely than not, these records are kept on

computers at the location that is the primary business headquarters of the illegal activity but may also be

stored at a residence of the owner or other person with a key role in the illegal business.  Additionally,

marketing materials including product pamphlets, business cards, product samples, and information

pertaining to the legality of the machines will be kept at the location that is the primary business headquarters

of the illegal activity but may also be stored with persons employed in sales or marketing of the business to

include their residence or vehicle(s).

90.     The owners of these businesses that illegally operate video gaming machines often hoard cash

outside the reach of financial institution, at their residences and business locations.  They use nominee names

to purchase and hide assets.  They maintain detailed financial records of their business in order to deter theft

by employees and be able to share the appropriate amount of gambling proceeds with their confederates.

91.     Persons engaged in illegal gambling businesses commonly keep records for lengthy periods of

time.  They commonly maintain computer files, books, records, receipts, notes, ledgers, journals, diaries,

address books, and other sundry papers or electronic evidence relating to their activity.  Individuals involved

in illegal gambling commonly are involved in multi-source, multi-customer, long-term activities, and

therefore, must keep careful records of their prior illegal transactions.

VIII.   COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC
ANALYSIS

92.     As described above and in Attachment B, this application seeks permission to search for

records that might be found at the premises referenced above and in Attachments A-1 through A-4, in

whatever form they are found.  One form in which the records might be found is data stored on a computer's

hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic

storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

Page 44  AFFIDAVIT OF Jason E. Lamb

93.     I submit that if a computer or storage medium is found on the premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this

evidence, because special software is typically required for that task.  However, it is

technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically

downloaded into a temporary Internet directory or "cache."

e.  Based on actual inspection of other evidence related to this investigation, I am aware

that computer equipment was used to generate, store, and transmit information used in

illegal gaming.  There is reason to believe that there are computer systems currently

located on the locations identified in Attachments A-1 through A-4.

94.    As further described in Attachment B, this application seeks permission to locate not only

computer files that might serve as direct evidence of the crimes described on the warrant, but also for

forensic electronic evidence that establishes how computers were used, the purpose of their use, who used

them, and when. There is probable cause to believe that this forensic electronic evidence will be on any

storage medium in the premises because:

a.  Data on the storage medium can provide evidence of a file that was once on the

storage medium but has since been deleted or edited, or of a deleted portion of a file

(such as a paragraph that has been deleted from a word processing file). Virtual

memory paging systems can leave traces of information on the storage medium that

show what tasks and processes were recently active.  Web browsers, e-mail programs,

and chat programs store configuration information on the storage medium that can

reveal information such as online nicknames and passwords.  Operating systems can

record additional information, such as the attachment of peripherals, the attachment of

USB flash storage devices or other external storage media, and the times the computer

was in use. Computer file systems can record information about the dates files were

created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contains information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic

storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is

evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

95. As is the case of the operation in the SweepsCoach/Burkiworks gaming business, the use of a computer is an essential and central tool to commit the violations listed earlier in the affidavit. As such, I understand that computers will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

96. In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary

to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

Page 50  AFFIDAVIT OF Jason E. Lamb

97.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

98.    As it is known that persons other than MECHAM, STOCKS and EDWARDS may share each of the premises, it is possible that the locations will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

99.    SweepsCoach/Burkiworks is or was an active internet gaming operation, with potentially some of its activities legal and legitimate.  As mentioned before, the focus of this investigation was illegal gaming in California and Arizona, no determination is attempted at this time to ascertain the legality of gaming products provided to other states.  As such, the seizure of computer(s) from this search site may limit the businesses ability to conduct any legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably.  Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.  If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## IX.    SUMMARY OF PERTINENT FINANCIAL ANALYSIS

100. A thorough tracing of funds through the SweepsCoach Entities and subsidiary owner's bank accounts is still ongoing. Records have been received and analyzed for most bank accounts through July 31, 2017. Due to the complexity of the financial network of the individuals controlling the SweepsCoach Entity accounts and accounts receiving gaming funds, it is difficult to obtain current banking information timely from the financial institutions as well as to fully analyze the records due to their complexity at the time of the submission of this affidavit. The SweepsCoach Entities utilized over thirty-two (32) bank accounts at nineteen (19) different financial institutions to accomplish their illegal gambling business and the funneling and distancing of funds. In addition to the financial accounts directly connected to the SweepsCoach Entities or the recipient of said funds, agents identified over thirty (30) additional accounts associated to the scheme. The associated accounts were also examined as part of this investigation.

101. To execute their scheme, the SweepsCoach Entities maintained various front-line accounts that received deposits directly from internet gambling cafés, usually through cash deposits into SweepsCoach Entity accounts at branches near the café. From January 1, 2012 through July 31, 2017, approximately $14 million in gaming proceeds was deposited into these accounts. From there, the gambling proceeds were moved through subsequent layers of accounts that appear to have no legitimate business purpose and are disconnected from the SweepsCoach Entities themselves. Specifically, the funds were moved from the first tier of accounts – most of the accounts bore the SweepsCoach or Burkiworks brand name – to second and third tiers of accounts with no apparent connection to the SweepsCoach Entities and merely operated as flow-through or holding accounts.

102. As discussed above, the majority of deposits into the SweepsCoach Entities accounts were cash from internet café owners in their local bank branch. Rather than deposit currency into their own accounts, the café operators would deposit cash directly into the SweepsCoach Entities accounts. Although a café operator might deposit only $1,000 or $2,000 during their visit, requiring no identification to the bank

teller, other café owners would deposit cash into the same account at other branches in California, Arizona and elsewhere. Surveillance photos obtained from the banks frequently reflect café operators holding up a phone screen to a bank teller, likely showing the teller the correct account to which make the deposit. Many of the persons depicted in the footage depositing cash into the SweepsCoach Entities accounts have since been identified, including many persons connected to internet café searched by law enforcement.

103.   Any proceeds generated  by SweepsCoach in California or Arizona are illegal and thus were treated as Specified Unlawful Activity ("SUA") proceeds for the purpose of tracing in a money laundering investigation. Very few internet cafés paid the SweepsCoach Entities by check and those that did were primarily located in other states such as Florida and Texas. Even then, those checks were deposited directly into the SweepsCoach Entities accounts at a local bank branch near the out-of-state cafes. Rarely were payments mailed directly to the El Dorado Hills, California SweepsCoach/Burkiworks office for deposit, so El Dorado Hills area branch deposits into the SweepsCoach Entities accounts were uncommon and not substantial. The vast majority of deposited funds into the SweepsCoach Entities accounts were cash or credit processing company payments. Credit processing was performed by several intermediaries which allowed internet café operators to pay by credit card to the processor and the processor would aggregate the funds and direct deposit the proceeds into the SweepsCoach Entities accounts. Most of the currency deposits made in California were made in Bakersfield and Southern California where the bulk of the SweepsCoach supported internet gaming cafés were located. As the type of gaming provided by the SweepsCoach Entities has been identified as illegal in California and Arizona and the SweepsCoach Entities appear to offer no other product to their customers, any funds received from customers in California and Arizona were considered to be SUA. As such, to identify which deposited funds into the SweepsCoach Entities accounts were to be considered SUA, I analyzed the bank branch deposit locations for cash deposits and the credit account subscriber address for credit card processing payments. If a cash deposit was made in Arizona or California, the funds

were considered to be SUA proceeds.  Likewise, if a credit processing payment was made by an individual

with a credit card account subscriber address in Arizona or California, those funds were deemed to be SUA.

Finally, for any deposited check bearing an Arizona or California address, the funds were considered SUA.

Gaming receipts received from any other entities located in states outside of Arizona and California were

treated as clean, non-SUA funds, and excluded from the tracing analysis.  Although the funds from states

outside of Arizona and California were excluded, most states have their own gaming laws which might make

this type of internet gaming illegal.  As the majority of funds in this investigation originated from Arizona

and California, a more conservative approach was taken to analyze the deposits originating in other states

were treated as untainted.

104.    Below is a chart that provides a graphical representation of the money flow, from the initial

deposit of SUA funds – gaming proceeds – to the subsequent movement of funds through the SweepsCoach

Entities' universe of accounts.  The chart illustrates the complexity of the SweepsCoach Entities' banking

practices and the movement of funds to disconnected entities and individuals, a practice more indicative of a

money laundering scheme than a legitimate business operation.  As currently detailed (and intended by the

SweepsCoach Entities), the chart below is convoluted, but is necessary to illustrate the scheme.  In the pages

immediately following the chart, I have created three additional charts that explain each financial layer and

its role in the scheme.  The full, convoluted chart:



105.   Fully analyzed and broken down into a digestible framework, the *first* layer of accounts receive gaming proceeds directly from the internet cafés– referred to herein as the "Primary Deposit Accounts."  Once the accounts have received gaming proceeds, the funds were used to pay the gaming software licensing fees to Hurrington Group KFT before transferring funds to other accounts.  Below is a chart showing the eight Primary Deposit Accounts:



106.    The *second* financial layer represents accounts that receive funds directly from Primary Deposit Accounts – the "Flow-Through Accounts." Funds would be transferred from Primary Deposit Accounts to Flow-Through Accounts, removing and distancing the funds from the Primary Deposit Accounts. The funds in these accounts were frequently used to pay operational costs, including utilities, taxes, payroll and rent to operate the SweepsCoach and Burkiworks storefronts and pay employees. The movement of funds to Flow-Through Accounts introduced a financial layer between the retail gaming businesses and the SweepsCoach Entities and lacks a business purpose. Even after the funds were received into these accounts, the proceeds frequently moved back-and-forth between the accounts before moving to the next tier of accounts, the "Holding Accounts." Below is a chart of the twelve Flow-Through Accounts:



107.    The *third* financial layer of accounts received funds from the Flow-Through accounts and were used to hold or spend funds – referred to herein as "Holding Accounts."[4]  In contrast to previously described accounts, the Holding Accounts frequently had substantial balances and funds remained in the accounts for longer periods of time and were earmarked for day-to-day purchases.  Below is a chart showing the twelve Holding Accounts:

---

[4] Although the primary source of funding for the Holding Accounts is through the Flow-Through Accounts, several accounts received proceeds directly from Primary Deposit Accounts.



108. Because of the scheme's complexity and account numerosity, each chart is reproduced prior to a more lengthy discussion of each account (by grouping) to be seized.

## A. FORFEITURE THEORIES RELATIVE TO THE FINANCIAL ACCOUNTS

109. The following section of this affidavit analyzes the financial accounts utilized by the Sweepstakes Entities and those individuals connected to the gaming business. Every attempt was made to obtain current financial records of the SweepsCoach Entities accounts, including subsidiary accounts held by the owners and operators of the entities, it is extremely difficult to obtain up to date account information due to the volume of records requested and turn-around of production by the financial institutions. Accordingly, the dates of records analyzed and last known account balance of each account will be identified in the discussion.

110.    In the sections below, each asset will be identified and three forfeiture theories will be discussed throughout the affidavit, 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C) and 984.

111.    18 U.S.C. § 981(a)(1)(A) - Property "involved in" a money laundering offense (Title 18 U.S.C. §1956) which includes the actual funds laundered, commingled funds, and any property traceable to such property

112.    18 U.S.C. § 984 - Where property involved in the forfeiture action is cash or monetary instruments in bearer form which are deposited into a financial institution, it shall not be necessary to identify the specific property involved in the offense and it shall not be a defense that the funds involved in the crime were deposited, removed and replaced with identical funds which were not used in the action arising to forfeiture of the funds.  The forfeiture action involving the funds that is the basis of this violation must have occurred within the last 1 year of the offense and will be based on forfeiture of proceeds of illegal activity under Title 18 U.S.C. §981(a)(1)(C).  For the purposes of this tracing, I utilized the date of November 1, 2016 for the 12 month tracking period as the start date.

113.    18 U.S.C. § 981(a)(1)(C) - Direct tracing of "proceeds" from violating Title 18 U.S.C. §1955, operation of an illegal gambling business.  These funds are often referenced as SUA proceeds pursuant to 18 U.S.C. §1961(1).  This method requires the direct tracing of SUA proceeds.

114.    18 U.S.C. § 981(b) – Any property subject to forfeiture to the United States under 18 U.S.C. § 981(a) may be seized by the Attorney General and, in the case of property involved in a violation investigated by the Secretary of the Treasury or the United States Postal Service, the property may also be seized by the Secretary of the Treasury or the Postal Service.[5]

---

[5] Pursuant to 18 U.S.C. § 981(b)(3), and notwithstanding the provisions of Rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement.  There is substantial probability that the United States will prevail on the issue of forfeiture.  Your affiant believes that a failure to issue seizure warrants will result in the above described assets

Page 59  AFFIDAVIT OF Jason E. Lamb

115.    When tracing funds to support forfeiture under 18 U.S.C. § 981(a)(1)(C), I utilized the "Good-In, First-Out" method or "GIFO". The GIFO method is a well-established tracing method where "clean funds" (including funds which cannot be established as SUA such as cash) are segregated from SUA funds in the tracing analysis until they have been disbursed from the account. Under the GIFO method, "clean funds" transferred into a bank account are assumed to be the first funds to leave the account. For example, if a bank account is opened using $100,000 in clean funds and then $100,000 in illicit proceeds are later deposited into the account, using the GIFO method, the first $100,000 leaving the account is assumed to be the clean or untainted funds leaving only the illicit funds behind. All subsequent transactions from this account will be deemed as illicit or SUA proceeds unless a new clean deposit is transacted into the account and the tracing will continue until the clean money is dispensed from the account.

116.    Based on his review, I believe the circuitous movement of SUA funds throughout the SweepsCoach Entities' and subsidiary bank accounts served little business purpose other than to move the money away from the primary deposit accounts. Often, these primary deposit accounts maintained low balances as the funds were transferred to other accounts on a frequent, often weekly, basis if the balances grew too large. The routing of SUA gaming proceeds through these accounts appears to have been done to conceal and disguise the nature, source, ownership or control of the proceeds, including:

(1) Transferring SUA proceeds through nominees in order to effectuate purchases of property;

(2) Conducting financial transactions in order to hide or conceal the nature, source, control or ownership of the SUA proceeds;

(3) Commingling legitimate funds with SUA proceeds in an attempt to add legitimacy to the SUA proceeds;

---

being transferred, liquidated, destroyed and/or removed from the jurisdiction of this court and/or being otherwise made unavailable for forfeiture.

(4) Notations made in the memo section of checks to portray that the funds are being paid to a vendor for services provided, such as listing of invoice numbers, in an attempt to make the entity appear to be independent from the entity issuing the check.

(5) Use of various business entities to obfuscate the paper trail.

## B.  PRIMARY DEPOSIT ACCOUNTS

117.    As explained above, Primary Deposit Accounts received funds directly from the Internet cafés, depicted graphically as follows:



### i.    Account No. 1 – Abnom, Inc. dba Sweepscoach, Chase Bank Acct No. ***4887

118.    Abnom, Inc. dba Sweepscoach, Chase Bank Account ***4887, ("ABN ***4887") was opened prior to the period of this investigation of January 1, 2012 by MECHAM and remained open until closure on or about October 11, 2012.  From January 1, 2012 to October 11, 2012, internet cafés deposited

approximately $75,432 of gaming funds into ABN***4887. A review of the line-item transactions for ABN ***4887 revealed deposits from gaming entities and persons associated to gaming such as Big Chief Games, Cheyenne, WY; Internet Solutions, Macon, MS and Internet Gametime, Sugarland, TX. In addition, the account received limited currency deposits in California and Arizona, totaling only $2,615, or 3.5% of the total gaming deposits. No forfeiture analysis will be completed for this account as it has been closed.

### ii. Account No. 2 – James E Mecham, Sole Prop dba Sweepscoach, Bank of America Acct No. ***0817

119. The James E. Mecham dba Sweepscoach, Bank of America Account ***0817, ("SWE ***0817") was opened on January 9, 2012 by MECHAM as the owner and remained open until closure on or about July 10, 2013 . From January 1, 2012 through July 10, 2013, account SWE***0817 received approximately $272,875 in gaming customer deposits. A review of the deposits revealed that $137,925 were made at branches in California and $134,950 from other states. The funds were deposited primarily in currency with 51% occurring in California. As referenced above, the deposits from California based clients or into California bank branches was identified as SUA proceeds for the purposes of tracing. Once the funds were deposited, they were transferred into another account held at Bank of America under the same name, SWE***1415, which will be discussed later. A review of line-item transactions of account SWE***0817 show that the vast majority of deposits nationwide were made in currency, but several were done by check at a branch near the client. Notations in the memo line on these checks make clear their purpose such as from Capital Marketing of SC, Surfside Beach, SC: "purchase 50,000 credits;" Paco's Computer Solution, LLC, Altomonte Springs, FL: "more credits;" SMDL, Inc, Sacramento, CA: "more credits;" Playtime Enterprises, Cleveland, OH: "purchase 5000 credits" and Lockwood Village Plaza, Ltd, Coral Springs, FL: "Cash Bash Sweepstakes Café- Credits." No forfeiture analysis will be completed for this account as it has closed.

### iii. Account No. 3 – James Eric Mecham dba Abnom dba Stuff About Games, Wells Fargo Acct No. ***5676

120.    The James Eric Mecham dba Abnom dba Stuff About Games, Wells Fargo account ***5676 ("SAG***5676") was opened on or about December 11, 2003 and remained opened until closure on September 2, 2015. From January 1, 2012 to September 2, 2015, Internet cafés deposited approximately $659,394 of gaming proceeds into account SAG***5676. A review of the deposits made, primarily in currency, revealed that $75,852 were made at branches in California, $62,810 at branches in Arizona and $520,732 from other states. During this time frame, confirmed California and Arizona deposits accounted for only 21% of the total gaming into the account. It should be noted that the SweepsCoach Entities were using several accounts at this time to receive deposits which could account for the lower percentage of California deposits. Furthermore, account SAG***5676 received credit processing deposits which could not be connected to customers in California or Arizona and thus treated as untainted funds.

121.    SAG***5676 is a hybrid account where although it receives direct gaming café deposits, it also received a large volume of funds, $7,823,306, from other Primary Deposit Accounts. A review of deposits for SAG***5676 show deposits from gaming entities and persons associated to gaming such as Iconnect, Panorama City, CA; Mi Expresso Café, Arvin, CA[6] and Lucky Times, LLC Waterford, MI. As mentioned before, the majority of the deposits into the SweepsCoach Entities accounts from customers were done with currency or money orders, many of these clients would include their information or a notation on the deposit slip or money order before making the transaction at their local branch so that SweepsCoach staff would be able to determine the purpose of the deposit. Examples of notations on the deposit slips would include: "25,000 credits," "5,000 parlor credits" and "café units." As mentioned before, SAG***5676 received direct gaming proceeds from clients as well as transfers from other SweepsCoach Entities accounts. Between January 1, 2012 through September 2, 2015, SAG***5676 received a total of $10,577,859 in funds

---

[6] The payment from Iconnect, Panorama City, CA is associated to Gabriela Gonzalez, who was charged in Arizona for operating an illegal Internet gaming café and later arrested in Arvin, CA by BGC for utilizing  SweepsCoach software at her Mi Expresso Internet Café which was discussed in an earlier section of the affidavit.

with $5,218,435 traceable as SUA proceeds from other accounts or through deposits from gaming clients in California or Arizona.

122.     In contrast to other Primary Deposit Accounts, SAG***5676 was utilized to pay the software licensing fees to Hurrington Group KFT as referenced in an earlier section. In total, SAG***5676 transferred $2,925,084 to Hurrington Group KFT in Budapest, Hungary. The remainder of the funds in SAG***5676 were transferred to accounts held under the control of MECHAM such as Redwood Ventures and Madrone Enterprises. No forfeiture analysis will be completed for this account as it has been closed.

### iv.     Account # 4 – Abnom, Inc. dba Sweepscoach dba Stuff About Games, Wells Fargo Acct ***6531

123.     The Abnom, Inc. dba Stuff About Games, Wells Fargo account ***6531 ("ABN***6531") was opened by MECHAM on October 18, 2011 and remained open until September 2, 2015. Between January 1, 2012 to September 2, 2015, internet cafés deposited approximately $6,500,506 of gaming monies into account ABN***6531. A review of the deposits, made primarily in currency, revealed that $4,521,466 were made at branches in California, $436,998 at branches in Arizona and $1,542,041 in other states. During this time frame, the California and Arizona deposits accounted for 76% of the total gaming deposits into the account and were considered to be SUA proceeds for the purposes of the forfeiture tracing. A review of deposits for ABN***6531 show deposits from gaming entities and persons associated to gaming such as Cheviot Cyber Café, Cheviot, OH; Gabriela Gonzalez, Panorama City, CA; Lucky Times, LC, Pontiac and Net Connection, Hayward, CA[7]. Examples of notations on the deposit slips would include: "14 Café Units & 1 Totem," "5000 totem & 150,000 Parlor," "Café Credits" and POS Credits." Once the funds had been deposited into ABN***6531, nearly all of the funds were moved to other SweepsCoach Entities accounts

---

[7] Net Connections is operated by Edward Doyle. Edward and Ron Doyle were affiliated with Capital Bingo which was prosecuted in the EDCA 2:15-cr-126 MCE. Shortly after law enforcement searched Capital Bingo headquarters in September 2014, Doyle established a relationship with and began making payments to the SweepsCoach Entities. Ron Doyle was part of a media interview discussed in a prior section of this affidavit where MECHAM was consulted as an expert.

held under the control of MECHAM.  No forfeiture analysis will be completed for this account as it has been closed.

>    **v.     Account # 5 – Burkiworks, Inc., Wells Fargo Acct \*\*\*7692**

124.    The Burkiworks, Inc. Wells Fargo account \*\*\*7692 ("BUR\*\*\*7692") was opened on August 21, 2015 by STOCKS as the owner with EDWARDS as the CEO.  The account was closed on September 8, 2016.  During the period the account was active, internet cafés deposited approximately $1,294,872 of gaming monies into BUR\*\*\*7692.  A review of the deposits made primarily in currency revealed that $1,103,182 were made at branches in California, $1,250 at branches in Arizona and $190,440 in other states. During this time frame, the California and Arizona deposits accounted for 85% of the total gaming deposits into the account.  Like account SAG\*\*\*5676, this account was utilized as a hybrid account where it received direct gaming café deposits and also transfers from other Primary Deposit Accounts, which totaled $1,946,769.  Likely the reason for other Primary Deposit Accounts to congregate their funds into BUR\*\*\*7692 was for the same reason as with account, SAG\*\*\*5676, to utilize the account to pay the software licensing fees to Hurrington Group KFT to retain access to gaming software for their clients.  In total, BUR\*\*\*7692 transferred $1,104,000 to Hurrington Group KFT in Budapest, Hungary.  A review of deposits for BUR\*\*\*7692 show deposits from gaming entities and persons associated to gaming such as EMT Marketing, Inc, Woodland Hills, CA and Mi Expresso Café, Arvin, CA.  As with prior Primary Deposit Accounts, the majority of the deposits were made with currency or money orders.  Examples of notations on the deposit slips included: "Coach Software Credits," "Credits-Sweep Coach 15,000 original" and "Sweepscoach Credits."[8]  A review of bank surveillance photos of deposits into BUR\*\*\*7692 show numerous customers throughout California and elsewhere making transactions, even showing bank tellers

---

[8] Although the name of the entity on the bank accounts had transitioned from SweepsCoach to Burkiworks, many existing customers continued to use the SweepsCoach name interchangeably with the Burkiworks name.
Page 65  AFFIDAVIT OF Jason E. Lamb

slips of paper or the screens on their smart phones, likely to ensure that the teller deposited the funds into the correct bank account. The remainder of the funds in BUR***7692 were transferred to accounts held under the control of MECHAM, STOCKS or EDWARDS such as Black Rock Investments, Santara Technology Solutions, Lemon Gold Ventures, Redwood Ventures and Madrone Enterprises. No forfeiture analysis will be completed for this account as it has been closed.

**vi.     Account # 6 – Burkiworks, Inc., Wells Fargo Acct ***3497**

125.    The Burkiworks, Inc. Wells Fargo account ***3497 ("BUR***3497") account was opened on August 21, 2015 along with BUR***7692 and BUR***7700(which will be discussed later), identifying STOCKS as the owner and EDWARDS as the CEO. This account was also closed on September 8, 2016. Between August 21, 2015 to September 8, 2016, internet cafés deposited approximately $1,286,535 of gaming monies into BUR***3497. A review of transactions, made primarily in currency, revealed that $962,315 was deposited at branches in California, $6,000 at branches in Arizona and $318,220 in other states. During this time frame, the California and Arizona deposits, identified as SUA proceeds, accounted for 75% of the total gaming deposits into the account. A review of deposits for BUR***3497 reveal deposits from gaming entities and persons associated to gaming such as Cyber Wave Cafe, Nipomo, CA; Reece & Briones Holdings, Ronda, NC and Richard Ehrlinspiel, San Anselmo, CA. Some notations on deposit slips include: "Netagogo Credits," "Sweeps Credits," "Credits Sweepscoach/Xtreme" and "Software/Minutes Fee." After deposit, the majority of funds held within this account were moved to BUR***7692 to assist in paying for the licensing fees to Hurrington Group KFT. No forfeiture analysis will be completed for this account as it has closed.

**vii.    Account # 7 – Burkiworks, Inc., Wells Fargo Acct ***7700**

126.    The Burkiworks, Inc. Wells Fargo account ***7700 ("BUR***7700") account was opened on August 21, 2015 along with BUR***3497 and BUR***7692 listing STOCKS as the owner and EDWARDS

as the CEO. The account was also closed along with the other two accounts on September 8, 2016. From August 21, 2015 through September 8, 2016, Internet cafés deposited approximately $776,566 in gaming monies into BUR***7700. A review of transactions revealed that $693,490 was deposited at branches in California and $83,076 in other states. During this time frame, the California deposits accounted for 89% of the total gaming deposits into the account. BUR***7700 received the vast majority of deposits in the form of currency or money orders with the remitter block left unfilled. Occasionally, a client would make a notation on a deposit slip or money order prior to deposit to indicate from whom or to what purpose the payment was being made. A review of these items revealed that the account received deposits from gaming entities and persons associated to gaming such as Gabriela Gonzalez and Internet Connect, Bakersfield, CA. Like with account BUR***3497, the majority of funds held within this account were moved to BUR***7692 to assist in paying for the licensing fees to Hurrington Group KFT. No forfeiture analysis will be completed for this account as it has closed.

### viii.   Account # 8 - Burkiworks, Inc., Bank of America Acct ***4044

127.   The Burkiworks, Inc., Bank of America account ***4044 ("BUR***4044") was opened on October 8, 2015 by STOCKS as the President and remained open through July 31, 2017. BUR***4044 has become the primary account to receive and disburse funds for the SweepsCoach organization. Since October 8, 2015, internet cafés deposited approximately $3,369,569 in gaming proceeds into BUR***4044. A review of the transactions showed that $3,011,307 was deposited at branches in California and only $358,262 in other states. During this time frame, the California deposits accounted for 89% of the total gaming deposits into the account. BUR***4044 not only receives gaming deposits but also pays the software licensing fees to Hurrington Group KFT. In total, BUR***4044 transferred $1,042,000 to Hurrington Group KFT in Budapest, Hungary.

128.    A review of deposits for BUR***4044 show deposits from gaming entities and persons associated to gaming such as EMT Marketing, Inc., Woodland Hills, CA; Gamex LLC, Raleigh, NC; George's Liquor and Jr. Market, Van Nuys, CA; Bristol Web, Santa Ana, CA and PCH Internet Solutions, Reseda, CA. As with prior Primary Deposit Accounts, the majority of the deposits were made with currency or money orders with some clients depositing checks directly into the BUR***4044 account at their local branches. Examples of notations on the deposit slips included: "2035 Nelson St, Bksfld, CA," "credits," "Netagogo Credits," "Software" and "SCO Credits." The remainder of the funds in BUR***4044 were distributed to various entities under the control of MECHAM, STOCKS or EDWARDS, such as Black Rock Investments, Santara Technology Solutions, Sierra Executive Group and Lemon Gold Ventures. As of July 31, 2017, BUR***4044 held a balance of $146,882.17.

### *Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)*

129.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in BUR***4044 between January 1, 2012 through July 31, 2017, were involved in money laundering transactions. The movement of funds from BUR***4044 to accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owners. The transfers concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Therefore, all funds held in BUR***4044 are subject to forfeiture.

### *Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984*

130.    Approximately $3,369,569 in gaming monies was deposited into BUR***4044 from October 8, 2015 to July 31, 2017, with $2,081,492 being traced to illegal gaming deposits for the one-year period of November 1, 2016 to October 31, 2017. Specifically, because accounts records were not made available after July 31, 2017, the $2,081,492 figure is the traceable amount for the nine-month period of November 1,

2016 to July 31, 2017.  Accordingly, up to $2,081,492 from BUR***4044 is subject to forfeiture as proceeds of an SUA under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

### *Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)*

131.    Banking records were analyzed for BUR***4044 from January 1, 2012 to July 31, 2017.  A GIFO analysis was conducted for the account and $146,710.45 of the funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation.  Applying 18 U.S.C. § 981(a)(1)(C), $146,710.45 of the remaining proceeds in BUR***4044 as of July 31, 2017 are subject to forfeiture.  BUR***4044's balance was $146,882.17 on July 31, 2017.

### C. FLOW-THROUGH ACCOUNTS

132.    Flow-Through Accounts received funds directly from Primary Deposit Accounts and were used to route funds to other accounts with no other apparent purpose.  Below is a chart depicting the twelve Flow-Through Accounts:



### ix.    Account # 9 – James E Mecham, Sole Prop dba Sweepscoach, Bank of America Acct ***1415

133.    James E Mecham, Sole Prop dba Sweepscoach, Bank of America Acct No. ***1415("SWE***1415") was opened on December 29, 2011 with MECHAM as the owner and was closed on or about July 10, 2013 along with Sweepscoach account SWE*0817.  SWE***1415 did not receive money directly from gaming businesses, but received transfers (check and wire) from Primary Deposit Accounts that received deposits directly from gaming businesses.  Almost exclusively, SWE***1415 received transfers from SWE***0817.   In total, SWE***1415 received $60,940 in SUA through SWE***0817.  Once the funds were deposited into account SWE***1415, they were transferred to other accounts under the control of the SweepsCoach Entities such as back to Sweepscoach account SWE***0817 or to the Stuff About Games account SAG***5676 as needed when software licenses were paid to Hurrington Group KFT.  No forfeiture analysis will be completed for this account as it has been closed.

### x.    Account # 10 – Stuff About Games, Wells Fargo Bank Acct ***1036

134.    The Stuff About Games, Wells Fargo Bank Account ***1036 ("SAG***1036") was opened on June 2, 2008 by MECHAM and remained open until September 2, 2015.  While open, and during the period of this investigation from January 1, 2012 through September 2, 2015, SAG***1036 was funded by gaming proceeds received through the Primary Deposit Accounts- Sweepscoach account SWE***6531 and Stuff About Games account SAG***5676.  Between these dates, SAG***1036 received a total of $150,747 in SUA funds.  SAG***held these tainted funds and transferred them back to the Stuff About Games account SAG***5676 as needed when software licenses were paid to Hurrington Group KFT but also passed funds directly onto MECHAM controlled accounts.  No forfeiture analysis will be completed for this account as it has been closed.

### xi.    Account # 11 – Lemon Gold Ventures, Inc., El Dorado Savings Bank Acct ***9728

135.    The Lemon Gold Ventures, Inc., El Dorado Savings Bank account ***9728 ("LEM***9728")
was opened by EDWARDS on January 25, 2016 and remained open until June 8, 2016.  While open, this
account acted as a pass-through/holding account for EDWARDS, only receiving funds the tainted
Burkiworks account BUR***7692, a Primary Deposit Account.  From January 25, 2016 through June 8,
2017, LEM***9728 received a total of $201,792 in SUA funds.  Once the funds were deposited in
LEM***9728, they were either spent through the use of a debit card or transferred to an account at Bank of
America also named Lemon Gold Ventures under the control of EDWARDS which will be discussed later.
No forfeiture analysis will be completed for this account as it has been closed.

### xii.    Account # 12 – Liberty Revocable Family Trust, Golden One Credit Union Acct ***5278(9)

136.    The Liberty Revocable Family Trust, Golden One Credit Union account ***5278(9)
("LIB***5278(9)") was opened on August 27, 2015 by MECHAM as Trustee and his wife, Jenny Mecham,
as Co-Trustee.  LIB***5278(9) received funds from many MECHAM controlled entities such as the Primary
Deposit Account- Stuff About Games, SAG***5676 and other Pass-Through and Holdings accounts to be
discussed later under the names of: Black Rock Investments, Phoenician Holdings, Redwood Ventures,
Madrone Ventures and Baboon Productions.  Between August 27, 2015 and July 31, 2017, LIB***5278(9)
received at least a total of $834,670 in SUA funds.  Once the funds were deposited in LIB***5278(9), they
were either withdrawn in cash, used in the purchase of real property or spent on taxes, tuition or other
miscellaneous household expenses.  As of July 31, 2017, LIB***5278(9) held a balance of $53,789.00.
Records for this account from October 1, 2016 through February 28, 2017 are currently pending.  Although
this account remained open, only $165 in SUA funds have been deposited into the account for the last twelve
months with available records.  As such, this account will not be included in the forfeiture analysis.

### xiii.    Account # 13 – Baboon Productions, High Desert Bank Acct ***2813

137.    Baboon Productions, High Desert Bank account ***2813 ("BAB***2813") received funds from many MECHAM controlled entities such as the Primary Deposit Account- Stuff About Games account SAG***5676 and other Pass-Through and Holdings accounts to be discussed later under the entities of: Black Rock Investments and Oakridge Management Group.  From September 30, 2015 through April 4, 2016, BAB***2813 received a total of $86,787 in SUA funds.  Once the funds were deposited in BAB***2813, they were dispensed through the use of a debit card or were transferred to other MECHAM controlled accounts under the names: Redwood Ventures, Liberty Enterprises UT and Liberty Revocable Family Trust account LIB***5278(9).  As of July 31, 2017, BAB***2813 held a balance of $12,397.47.

### *Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)*

138.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in BAB***2813 between September 30, 2015 through July 31, 2017, were involved in money laundering transactions.  The movement of funds from BAB***2813 to accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owners.  The transfers concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Therefore, all funds held in BAB***2813 are subject to forfeiture.

### *Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984*

139.    BAB***2813 has been dormant since April 4, 2016 with no additional SUA funds deposited within the last year from November 1, 2016 through October 31, 2017.  Although the account carries a balance that contains SUA traced funds, none of these funds are forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

### *Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)*

140.     Banking records were analyzed for BAB***2813 between the period of September 30, 2015 and July 31, 2017.  A GIFO analysis was conducted for the account and $10,356.55 of the funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation.  Applying 18 U.S.C. § 981(a)(1)(C), $10,356.55 of the remaining proceeds in BAB***2813 as of July 31, 2017 are subject to forfeiture.  BAB***2813's balance was $12,397.47 on July 31, 2017.

### xiv.     Account # 14 – Black Rock Investments, Inc., Bank of the West Acct ***5629

141.     The Black Rock Investments, Inc., Bank of the West account ***5629 ("BLA***5629") was opened by MECHAM on October 14, 2015 and closed on July 17, 2017.  BLA***5629 acted as a not only a Pass-Through Account for MECHAM but served as a Holding Account used to pay personal living expenses.  From October 14, 2015 through July 17, 2017, BLA***5629 was almost exclusively funded by Primary Deposit Accounts- Burkiworks account BUR***7692 and Burkiworks account BUR***4044.  Between these dates, BLA***5629 received a total of $924,747 in SUA funds.  Once the funds were deposited in BLA***5629, they were transferred to other accounts controlled by MECHAM or spent through the use of a debit card or checks to purchase a vehicle, pay taxes, make contributions to their church, or pay household bills.  During this time frame, MECHAM transferred $792,663 from BLA***5629 to entities accounts under his control to include: Coyote Ridge Outfitters, Lakeview Technologies, Madrone Ventures, Oakridge Management Group, Redwood Ventures, Pacific Ridge Management, Phoenician Holdings and Liberty Revocable Family Trust account LIB***5278(9).  No forfeiture analysis will be completed for this account as it has been closed.

### xv.     Account # 15 – Lakeview Technology, Wyochem Federal Credit Union Acct ***648-S9

142.     The Lakeview Technology, Wyochem Federal Credit Union account ***648-S9 ("LAK***648-S9") was opened by MECHAM as the owner on or about November 2, 2015 and remained

open through at least July 31, 2017. Between November 9, 2015 and February 12, 2016, LAK***648-S9 received a total of $33,980 in SUA funds from the Black Rock Investments account BLA***5629. Once the funds were deposited in LAK***648-S9, they were dispensed through the use of a debit card and checks including to other MECHAM controlled accounts such as Coyote Ridge Outfitters and MECHAM personal accounts which will be discussed later. As of July 31, 2017, LAK***648-S9 held a balance of $21,532.16.

### Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)

143.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in LAK***648-S9 between November 9, 2015 through July 31, 2017, were involved in money laundering transactions. The movement of funds from LAK***648-S9 to accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owners. The transfers concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Therefore, all funds held in LAK***648-S9 are subject to forfeiture.

### Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984

144.    LAK***648-S9 has been dormant since February 12, 2016 with no additional SUA funds deposited within the last year from November 1, 2016 through October 31, 2017. Although the account carries a balance that contains SUA traced funds, none of these funds are forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

### Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)

145.    Banking records were analyzed for LAK***648-S9 between the period of November 2, 2015 and July 31, 2017. A GIFO analysis was conducted for the account and all of the funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation. Applying 18 U.S.C. § 981(a)(1)(C), $21,532.16 in LAK***648-S9 as of July 31, 2017 is subject to forfeiture.

xvi.     **Account # 16 – Black Rock Investments, First Citizens Bank Acct \*\*\*6523**

146.    The Black Rock Investments, First Citizens Bank account \*\*\*6523 ("BLA\*\*\*6523") was opened on November 6, 2015 by MECHAM as the owner and remained open through at least July 31, 2017. From November 6, 2015 through July 31, 2017, BLA\*\*\*6523 was almost exclusively funded by Primary Deposit Accounts- Burkiworks account BUR\*\*\*7692 and Burkiworks account BUR\*\*\*4044.  During this period, BLA\*\*\*6523 received a total of $754,801 in SUA proceeds.  Once the funds were deposited in BLA\*\*\*6523, they were dispensed through the use of a debit card, wire transfers and checks for personal expenses or were transferred to other MECHAM controlled accounts under his control to include: Coyote Ridge Outfitters, Lakeview Technologies LAK\*\*\*648-S9, Madrone Ventures, Oakridge Management Group, Redwood Ventures, Pacific Ridge Management, Phoenician Holdings and Liberty Revocable Family Trust account LIB\*\*\*5278(9).  As of July 31, 2017, BLA\*\*\*6523 held a balance of $61,025.67.

*Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)*

147.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in BLA\*\*\*6523 between November 6, 2015 through July 31, 2017, were involved in money laundering transactions.  The movement of funds from BLA\*\*\*6523 to accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owners.  The transfers concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Therefore, all funds held in BLA\*\*\*6523 are subject to forfeiture.

*Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984*

148.    Between from November 1, 2016 through July 31, 2017, $299,066 in SUA proceeds have been deposited into BLA\*\*\*6523 within the last year for the tracking period from November 1, 2016 through October 31, 2017 used in this tracing.  Although the account only carried a balance of $61,025.67 as

of July 31, 2017, $299,066 in funds would be forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

### Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)

149.    Banking records were analyzed for BLA***6523 between the period of November 6, 2015 and July 31, 2017.  A GIFO analysis was conducted for the account and $59,404.60 of the funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation.  Applying 18 U.S.C. § 981(a)(1)(C), $59,404.60 of the remaining proceeds in BLA***6523 as of July 31, 2017 are subject to forfeiture.  BLA***6523's balance was $61,025.67 on July 31, 2017.

### xvii.    Account # 17 – Lemon Gold Ventures, Inc., Bank of America Acct ***7073

150.    The Lemon Gold Ventures, Inc., Bank of America account ***7073 ("LEM***7073") was opened on June 10, 2016 by EDWARDS as the Vice President and sole account signatory.  From June 10, 2016 through July 31, 2017, LEM***7073 was almost exclusively funded by Primary Deposit Accounts-Burkiworks account BUR***7692 and Burkiworks account BUR***4044 and a large transfer from the Lemon Gold Ventures account LEM***5278(9) upon its closure.  During this period, LEM***7073 received a total of $549,149 in SUA proceeds.  Once the funds were deposited in LEM***7073, they were dispensed through the use of a debit card and checks for personal expenses or were transferred to other EDWARDS controlled accounts under the entities of Washington Sinclair Technologies, Inc. and Cameo Holdings, which will be discussed later.  It should be noted that when checks were issued LEM***7073 to other EDWARDS controlled entities, invoice numbers or other descriptions were written in the memo line to make the transaction appear to be for the payment of services such as: "commission" or "Mgmt Services" and not just a pass-through transaction.  As of July 31, 2017, LEM***7073 held a balance of $71,934.06.

### Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)

151.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in LEM***7073 between June 10, 2016 through July 31, 2017, were involved in money laundering transactions. The movement of funds from LEM***7073 to accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owners. The transfers concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Therefore, all funds held in LEM***7073 are subject to forfeiture.

### *Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984*

152.    Between from November 1, 2016 through July 31, 2017, $263,456 in SUA proceeds have been deposited into LEM***7073 within the 1 year tracking period from November 1, 2016 through October 31, 2017. Although the account only carried a balance of $71,934.06 as of July 31, 2017, $263,456 in funds would be forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

### *Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)*

153.    Banking records were analyzed for LEM***7073 between the period of June 10, 2016 and July 31, 2017. A GIFO analysis was conducted for the account and all funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation. Applying 18 U.S.C. § 981(a)(1)(C), $71,934.06 in LEM***7073 as of July 31, 2017 are subject to forfeiture.

### xviii.    Account # 18 – Lemon Gold Ventures, Inc., Bank of America Acct ***0675

154.    Lemon Gold Ventures, Inc.'s Bank of America account ***0675 ("LEM***0675") was opened on June 10, 2016 by EDWARDS as the Vice President and sole account signor. In June of 2016, LEM***0675 was funded from Primary Deposit Account- Burkiworks account BUR***7692 and Flow-Through Account- Lemon Gold Ventures account LEM***7073. During this period, LEM***0675 received a total of $42,389 in SUA proceeds. Once the funds were deposited in LEM***0675, $32,987 was

transferred in June 2016 by check to the EDWARDS' Cameo Holdings account discussed below.  Since June of 2016, the account has been left dormant and as of July 31, 2017, LEM***0675 still held a balance of $44,004.95.

### *Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)*

155.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in LEM***0675 between June 10, 2016 through July 31, 2017, were involved in money laundering transactions.  The movement of funds from LEM***0675 to an account maintained by another identity gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owner.  The transfer concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Therefore, all funds held in LEM***0675 are subject to forfeiture.

### *Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984*

156.    LEM***0675 has been dormant since June of 2016 with no additional SUA funds deposited within the last year from November 1, 2016 through October 31, 2017.  Although the account carries a balance that contains SUA traced funds, none of these funds are forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

### *Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)*

157.    Banking records were analyzed for LEM***0675 between the period of June 10, 2016 and July 31, 2017.  A GIFO analysis was conducted for the account and $42,389.42 of the funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation.  Applying 18 U.S.C. § 981(a)(1)(C), $42,389.42 of the remaining proceeds in LEM***0675 as of July 31, 2017 are subject to forfeiture.  LEM***0675's balance was $44,004.95 on July 31, 2017.

### xix.  Account # 19 – Lemon Gold Ventures, Inc., Mechanics Bank Acct ***3421

158.    The Lemon Gold Ventures, Inc., Mechanics Bank account ***3421 ("LEM***3421") was opened on June 15, 2016 by EDWARDS as the Vice President and sole account signor. LEM***3421 was exclusively funded by Primary Deposit Accounts- Burkiworks account BUR***7692 and Burkiworks account BUR***4044 and received a total of $199,632 in SUA proceeds. Once deposited in LEM***3421, the funds were dispensed through the use of a debit card and checks for personal expenses or were transferred to EDWARDS' other accounts- Washington Sinclair Technologies, Inc. and Cameo Holdings which are discussed below. Similar to LEM***7073, I observed handwritten notations on the memo line of checks such as "Website Design" or "Coaching" to make the payment appear as a normal arms-length business transaction. As of July 31, 2017, LEM***3421 held a balance of $56,720.18.

### Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)

159.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in LEM***3421 between June 15, 2016 through July 31, 2017, were involved in money laundering transactions. The movement of funds from LEM***3421 to accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owners. The transfers concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Therefore, all funds held in LEM***3421 are subject to forfeiture.

### Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984

160.    Between from November 1, 2016 through July 31, 2017, $66,572 in SUA proceeds have been deposited into LEM***3421 within the last year tracking period used from November 1, 2016 through October 31, 2017. Although the account only carried a balance of $56,720.18 as of July 31, 2017, $66,572 in funds would be forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

*Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)*

161.    Banking records were analyzed for LEM***3421 between the period of June 15, 2016 and July 31, 2017.  A GIFO analysis was conducted for the account and all funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation.  Applying 18 U.S.C. § 981(a)(1)(C), $56,720.18 in LEM***3421 as of July 31, 2017 are subject to forfeiture.

### xx.    Account # 20 – Oakridge Management Group, 1st Bank, Division of Glacier Bank Acct ***8915

162.    The Oakridge Management Group, 1st Bank, Division of Glacier Bank account ***8915 ("OAK***8915") was opened on November 2, 2015 by MECHAM as the officer, Vice President of Marketing and sole account signor.  In November of 2015, OAK***8915 was funded solely with deposits from Flow-Through Account Black Rock Investments account BLA***5629.  During this period, OAK***8915 received a total of $32,950 in SUA proceeds.  Once deposited in OAK***8915, the funds were dispensed as checks to pay for incorporation services and to accounts controlled by MECHAM, including Baboon Productions account BAB***2813, an account held by Pacific Ridge Management discussed below and a personal account of MECHAM's.  As of July 31, 2017, OAK***8915 held a balance of $22,852.67.

*Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)*

163.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in OAK***8915 between November 2, 2015 through July 31, 2017, were involved in money laundering transactions.  The movement of funds from OAK***8915 to an account maintained by another identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owner.  The transfer concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Therefore, all funds held in OAK***8915 are subject to forfeiture.

***Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984***

164.     OAK\*\*\*8915 has been dormant since May of 2016 with no additional SUA funds deposited within the last year from the November 1, 2016 through October 31, 2017 tracking period.  Although the account carries a balance that contains SUA traced funds, none of these funds are forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

***Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)***

165.     Banking records were analyzed for OAK\*\*\*8915 between the period of November 2, 2015 and July 31, 2017.  A GIFO analysis was conducted for the account and $22,732.67 of the funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation.  Applying 18 U.S.C. § 981(a)(1)(C), $22,732.67 of the remaining proceeds in OAK\*\*\*8915 as of July 31, 2017 are subject to forfeiture.  OAK\*\*\*8915's balance was $22,852.67 on July 31, 2017.

### D. HOLDING ACCOUNTS

166.     The final level of accounts, referred to herein as "Holding Accounts," received funds from the Flow-Through accounts and were used to park funds and pay personal living expenses.  In contrast to previously described accounts, the Holding Accounts frequently had substantial balances and funds remained in the accounts for longer periods of time.  Below is a chart showing the twelve Holding Accounts:



### xxi.   Account # 21 – James E Mecham and Jenny E Mecham, Wells Fargo Bank Acct ***8213

167.    The James E Mecham and Jenny E Mecham, Wells Fargo Bank account

***8213("JJM***8213") was opened on January 27, 2012 by MECHAM and remained open until closure on

or about September 10, 2015.  JJM***8213 received its bulk of deposits from Primary Deposit Accounts-

Sweepscoach SWE***6531 and Stuff About Games SAG***5676 along with additional transfers from the

Flow-Through Account- Stuff About Games SAG***1036.  While the account was open, it received a total

of $536,570 in SUA proceeds.  Once the funds were deposited into account JJM***8213, they were used to

pay for personal living expenses along with some transfers back into other SweepsCoach Entities accounts,

another personal account for Jenny Mecham and a large transfer of $158,438.39 in December of 2014 to a

Redwood Ventures account which will be identified below.  No forfeiture analysis will be completed for this

account as it has been closed.

### xxii.   Account # 22 – Madrone Ventures, Inc., Wells Fargo Bank Acct ***0552

168.    The Madrone Ventures, Inc., Wells Fargo Bank account ***0552("MAD***0552") was opened on June 17, 2015 by MECHAM as an "owner with control of the entity" and remained open until closure on or about September 9, 2015.  MAD***0552 was funded by Primary Deposit Account- Stuff About Games SAG***5676 and Holding Account- Redwood Ventures to be discussed below as Account 24. During the short period the account was open, it received a total of $476,963 in SUA proceeds.  Once the funds were on receipt in account MAD***0552, they were used to purchase several pieces of real property and with the remaining funds transferred to an newly opened Madrone Ventures, Inc., account at El Dorado Savings Bank (discussed below) at the closure of MAD***0552.  No other activity was conducted within the account during the time that it was open.  No forfeiture analysis will be completed for this account as it has been closed.

### xxiii.   Account # 23 – Phoenician Holdings, LP, Umpqua Bank Acct ***8368

169.    The Phoenician Holdings, LP, Umpqua Bank account ***8368("PHO***8368") was opened on July 30, 2015 by MECHAM as a general partner with Jenny Mecham as the other general partner.  The account remained open until July 28, 2016.  PHO***8368 was funded by Primary Deposit Account- Stuff About Games SAG***5676 and Pass-Through Accounts- Black Rock Investments BLA***5629 and BLA***6523 and another account under the name of Phoenician Holdings which is not discussed in this affidavit and as such, the funds are being characterized as clean from this account.  During the span the account was open, it received a total of $115,476 in SUA proceeds.  Once the funds were placed into PHO***8368, they were dispensed through the use of a debit card, wire transfers and checks for personal expenses with some transferred to Pass-Through Account- Liberty Revocable Family Trust account LIB***5278(9).  No forfeiture analysis will be completed for this account as it has been closed.

xxiv.   **Account # 24 – Redwood Ventures, Inc., Bank of America Acct ***5652**

170.    The Redwood Ventures, Inc., Bank of America account  ***5652 ("RED***5652") was opened on October 21, 2013 by MECHAM as the "President" and only signatory on the bank account. RED***5652 was funded by Primary Deposit Account- Stuff About Games SAG***5676 and Pass-Through Accounts- Baboon Productions BAB***2813, Black Rock Investments BLA***5629 and BLA***6523 and Holding Account- James and Jenny Mecham JJM***8213.  During this period, RED***5652 received a total of $1,516,698 in SUA proceeds.  Once the proceeds were placed in RED***5652, the funds were dispensed through the use of a debit card, wire transfers and checks for personal expenses with some transferred to Pass-Through Account- Liberty Revocable Family Trust account LIB***5278(9).  As of July 31, 2017, RED***5652 held a balance of $77,263.90.

*Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)*

171.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in RED***5652 between October 21, 2013 through July 31, 2017, were involved in money laundering transactions.  The movement of funds from RED***5652 to an account maintained by another identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owner.  The transfer concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Therefore, all funds held in RED***5652 are subject to forfeiture.

*Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984*

172.    RED***5652 for the most part has been dormant since April of 2016 with no additional SUA funds deposited within the last year from the November 1, 2016 through October 31, 2017 tracking period.

Although the account carries a balance that contains SUA traced funds, none of these funds are forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

### *Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)*

173.    Banking records were analyzed for RED***5652 between the period of October 13, 2013 and July 31, 2017.  A GIFO analysis was conducted for the account and $4,466.80 of the funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation.  Applying 18 U.S.C. § 981(a)(1)(C), $4,466.80 of the remaining proceeds in RED***5652 as of July 31, 2017 are subject to forfeiture.  RED***5652's balance was $77,263.90 on July 31, 2017.

**xxv.    Account # 25 – Coyote Ridge Outfitters, Safe Credit Union Acct ***2910(9)**

174.    The Coyote Ridge Outfitters, Safe Credit Union account ***2910(9) ("COY***2910(9)") was opened on August 29, 2015 by MECHAM as the "President" and only account signor.   During this time, COY***3421 was funded by Primary Deposit Accounts- by Primary Deposit Account- Stuff About Games SAG***5676; Pass-Through Accounts- Black Rock Investments BLA***5629 and BLA***6523; Lakeview Technologies LAK***6488 and Oakridge Management Group OAK***8915.  COY***2910(9) received a total of $101,867 in SUA proceeds.  Once the funds were on deposit, they were dispensed through the use of a debit card and checks for personal expenses.  As of July 31, 2017, COY***2910(9) held a balance of $785.55.

### *Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)*

175.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in COY***2910(9) between August 29, 2015 through July 31, 2017, were involved in money laundering transactions.  The movement of funds into COY***2910(9) from accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the

Page 85  AFFIDAVIT OF Jason E. Lamb

same owners. The transfers concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Therefore, all funds held in COY***2910(9) are subject to forfeiture.

### *Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984*

176.    Between from November 1, 2016 through July 31, 2017, $40,731.35 in SUA proceeds have been deposited into COY***2910(9) within the last year tracking period used from November 1, 2016 through October 31, 2017. Although the account only carried a balance of $785.55 as of July 31, 2017, $38,731.35 in funds would be forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

### *Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)*

177.    Banking records were analyzed for COY***2910(9) between the period of October 29, 2015 and July 31, 2017. A GIFO analysis was conducted for the account and all funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation. Applying 18 U.S.C. § 981(a)(1)(C), $785.55 in COY***2910(9) as of July 31, 2017 are subject to forfeiture.

            **xxvi.    Account # 26 – Madrone Ventures, Inc., El Dorado Savings Bank Acct ***2902**

178.    The Madrone Ventures, Inc., El Dorado Savings Bank account ***2902 ("MAD***2902") was opened on September 18, 2015 by MECHAM as the owner which remained open through at least July 31, 2017. MAD***2902 was initially funded from Holding Account- Madrone Ventures MAD***0552 with funds upon that accounts' closure and later by Pass-Through Accounts- Black Rock Investments BLA***5629 and BLA***6523. MAD***0552 has received a total of $16,474 in SUA proceeds. Once the proceeds were placed in MAD***0552, the funds were dispensed in a check for a personal expense and through a transfer to Pass-Through Account- Liberty Revocable Family Trust account LIB***5278(9). As of July 31, 2017, MAD***0552 held a balance of $6,798.26.

**Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)**

179.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in MAD***0552 between September 18, 2015 through July 31, 2017, were involved in money laundering transactions.  The movement of funds into MAD***0552 from accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owners.  The transfers concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Therefore, all funds held in MAD***0552 are subject to forfeiture

**Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984**

180.    MAD***0552 has been dormant since April of 2016 with no additional SUA funds deposited within the last year from the November 1, 2016 through October 31, 2017 tracking period.  Although the account carries a balance that contains SUA traced funds, none of these funds are forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

**Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)**

181.    Banking records were analyzed for MAD***0552 between the period of September 18, 2015 and July 31, 2017.  A GIFO analysis was conducted for the account and $3,298.26 of the funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation.  Applying 18 U.S.C. § 981(a)(1)(C), $3,298.26 of the remaining proceeds in MAD***0552 as of July 31, 2017 are subject to forfeiture.  MAD***0552's balance was $6,798.26 on July 31, 2017.

### xxvii.   Account # 27 – Pacific Ridge Management Group, Inc., High Desert Bank Acct ***2826

182.    The Pacific Ridge Management Group, Inc., High Desert Bank account ***2826 ("PAC***2826") was opened on September 30, 2015 by MECHAM as the "Vice President of Marketing"

and only signatory on the account which has remained open through at least July 31, 2017. During this time, PAC***2826 was funded by Primary Deposit Account- Stuff About Games SAG***5676; Pass-Through Accounts- Black Rock Investments BLA***5629 and BLA***6523; and Oakridge Management Group OAK***8915. PAC***2826 has received a total of $108,889 in SUA proceeds. Once the proceeds were placed in PAC***2826, the funds were dispensed in checks and through the use of a debit card. As of July 31, 2017, MAD***0552 held a balance of $8,209.08.

### Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)

183.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in PAC***2826 between September 30, 2015 through July 31, 2017, were involved in money laundering transactions. The movement of funds into PAC***2826 from accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owners. The transfers concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Therefore, all funds held in PAC***2826 are subject to forfeiture

### Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984

184.    PAC***2826 has not received a deposit containing SUA proceeds since October of 2016, outside of the November 1, 2016 through October 31, 2017 tracking period. Although the account carries a balance that contains SUA traced funds, none of these funds are forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

### Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)

185.    Banking records were analyzed for PAC***2826 between the period of September 30, 2015 and July 31, 2017. A GIFO analysis was conducted for the account and $7,332.84 of the funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation. Applying 18 U.S.C. §

981(a)(1)(C), <u>$7,332.84</u> of the remaining proceeds in PAC***2826 as of July 31, 2017 are subject to forfeiture.  PAC***2826's balance was $8,209.08 on July 31, 2017.

### xxviii.  Account # 28 – Santara Technology Solutions, Inc., Umpqua Bank Acct ***1948

186.    The Santara Technology Solutions, Inc., Umpqua Bank account ***1948 ("SAN***1948") was opened on March 2, 2016 by STOCKS as the "Vice President" and only account signor.  From March 2, 2016 to July 31, 2017, SAN***1948 was exclusively funded by Primary Deposit Accounts- Burkiworks account BUR***7692 and Burkiworks account BUR***4044.  SAN***1948 received a total of $647,452 in SUA proceeds.  Once the funds were on deposit, they were dispensed through the use of a debit card and checks for personal expenses.  As of July 31, 2017, SAN***1948 held a balance of $320,334.01.

#### *Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)*

187.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in SAN***1948 between March 2, 2016 through July 31, 2017, were involved in money laundering transactions.  The movement of funds into SAN***1948 from accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owners.  The transfers concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Therefore, <u>all funds</u> held in SAN***1948 are subject to forfeiture.

#### *Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984*

188.    Between from March 2, 2016 through July 31, 2017, $284,913.53 in SUA proceeds have been deposited into SAN***1948 within the last year tracking period used from November 1, 2016 through October 31, 2017.  Although the account carried a balance of $320,334.01 as of July 31, 2017, only <u>$284,913.53</u> in funds would be forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

*Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)*

189.     Banking records were analyzed for SAN***1948 between the period of March 2, 2016 and July 31, 2017.  A GIFO analysis was conducted for the account and all funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation.  Applying 18 U.S.C. § 981(a)(1)(C), $320,334.01 in SAN***1948 as of July 31, 2017 are subject to forfeiture.

### xxix.     Account # 29 – Sierra Executive Group, Inc., Tri-Counties Bank Acct ***9991

190.     The Sierra Executive Group, Inc., Tri-Counties Bank account ***9991 ("SIE***9991") was opened on August 30, 2016 by STOCKS as the "Corporate Secretary" and only account signatory.  Account SIE***9991 remained open through July 30, 2017 and was exclusively funded by Primary Deposit Accounts- Burkiworks account BUR***4044.  SIE***9991 received a total of $15,609 in SUA proceeds.  Once the funds were on deposit, they were dispensed through the use of a debit card and checks for personal expenses and to pay for business expenses associated to the business office located at 877 Embarcadero, Ste 1 and "storage" or "suite 2."  As of July 30, 2017, SIE***9991 held a balance of $3,427.63.

*Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)*

191.     Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in SIE***9991 between August 30, 2016 through July 30, 2017, were involved in money laundering transactions.  The movement of funds into SIE***9991 from accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owners.  The transfers concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Therefore, all funds held in SIE***9991 are subject to forfeiture.

*Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984*

192.    Between from November 1, 2016 through July 30, 2017, $12,300 in SUA proceeds have been deposited into SIE***9991 within the last year tracking period used from November 1, 2016 through October 31, 2017.   Although the account carried a balance of only $3,427.63 as of July 30, 2017, $12,300 in funds would be forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

### *Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)*

193.    Banking records were analyzed for SIE***9991 between the period of August 30, 2016 and July 30, 2017.   A GIFO analysis was conducted for the account and $3,271.45 in funds on account, as of July 30, 2017, were found to be traceable to the illegal gaming operation.   Applying 18 U.S.C. § 981(a)(1)(C), $3,271.45 of the remaining proceeds in SIE***9991 as of July 30, 2017 are subject to forfeiture. SIE***9991's balance was $3,427.63 on July 31, 2017.

### xxx.   Account # 30 – Washington Sinclair Technologies, Inc., Bank of America Acct ***7633

194.    The Washington Sinclair Technologies, Inc., Bank of America account ***7633 ("WAS***7633") was opened on or about March 23, 2017 by EDWARDS and remained open through August 31, 2017.   During this time, WAS***7633 was primarily funded by Pass-Through Accounts- Lemon Gold Ventures LEM***7073 and LEM***3421.   WAS***7633 received a total of $160,013 in SUA proceeds.   Once the funds were on deposit, they were dispensed through the use of a debit card and checks for personal expenses.   As of August 31, 2017, WAS***7633 held a balance of $134,768.99.

### *Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)*

195.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in WAS***7633 between March 23, 2017 through August 31, 2017, were involved in money laundering transactions.   The movement of funds into WAS***7633 from accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same

owners. Furthermore, checks paid into WAS***7633 by Pass-Through Accounts- Lemon Gold Ventures

LEM***7073 and LEM***3421 listed in the memo section misleading statement such as: "software,"

"commission" and "mgmt services" to make it appear that Washington Sinclair Technologies, Inc., was a

client of Lemon Gold Ventures and not owned by the same individual.  The transfers concealed and

disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

Therefore, all funds held in WAS***7633 are subject to forfeiture.

### *Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984*

196.    Between from March 23, 2017 through August 31, 2017, $160,013 in SUA proceeds have

been deposited into WAS***7633 within the last year tracking period used from November 1, 2016 through

October 31, 2017.  Although the account carried a balance of only $134,768.99 as of August 31, 2017,

$160,013 in funds would be forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

### *Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)*

197.    Banking records were analyzed for WAS***7633 between the period of March 23, 2017 and

August 31, 2017.  A GIFO analysis was conducted for the account and all funds on account, as of July 31,

2017, were found to be traceable to the illegal gaming operation.  Applying 18 U.S.C. § 981(a)(1)(C),

$134,768.99 in WAS***7633 as of August 31, 2017 are subject to forfeiture.

### xxxi.   Account # 31 – Cameo Holdings, Inc., UniWyo FCU Acct ***1324

198.    The Cameo Holdings, Inc., UniWyo FCU account ***1324 ("CAM***1324") was opened on

or about February 16, 2016 by EDWARDS as the owner and sole signatory and remained open at least

through August 31, 2017.  During this time, CAM***1324 was primarily funded by Primary Deposit

Account- Burkiworks BUR***7692 and Pass-Through Accounts- Lemon Gold Ventures LEM***7073 and

LEM***3421.  CAM***1324 received a total of $292,508 in SUA proceeds.  Once the funds were on

deposit, they were dispensed through the use of a debit card and checks for personal expenses. As of August 31, 2017, CAM***1324 held a balance of $60,408.73.

### Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)

199.    Applying 18 U.S.C. § 981(a)(1)(A), I believe all the funds (both illicit and clean) in CAM***1324 between February 16, 2016 through August 31, 2017, were involved in money laundering transactions. The movement of funds into CAM***1324 from accounts maintained by other identities gave the appearance of transferred ownership when, in fact, the accounts and entities were controlled by the same owners. The transfers concealed and disguised the true ownership and character of the proceeds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Therefore, all funds held in CAM***1324 are subject to forfeiture.

### Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984

200.    Between from November 1, 2016 through August 31, 2017, $113,809.91 in SUA proceeds have been deposited into CAM***1324 within the one-year period of November 1, 2016 through October 31, 2017. Although the account balance was $60,408.73 on August 31, 2017, $113,809.91 in funds would be forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits). It should be noted that records for the period of August 1, 2017 through August 31, 2017 were unavailable for the transferring bank accounts, LEM***7073 and LEM***3421, for a deposit of $52,055 into CAM***1324 on August 31, 2017 at the time this affidavit was drafted. As of July 31, 2017, the balances of LEM***7073 and LEM***3421 consisted of only SUA proceeds prior to transferring the funds to CAM***1324. As these accounts contained exclusively tainted funds as of July 31, 2017 and there were more than enough funds to transfer these proceeds to CAM***1324 without additional sources, these funds were treated as SUA proceeds until a further analysis could be completed.

*Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)*

201.    Banking records were analyzed for CAM***1324 from February 16, 2016 to August 31,

2017.  A GIFO analysis was conducted for the account and $8,353.73 in funds on account, as of August 31,

2017, were traceable to the illegal gaming operation.  Applying 18 U.S.C. § 981(a)(1)(C), all of the funds,

$60,408.73 in CAM***1324 as of August 31, 2017 are subject to forfeiture.

### xxxii.  Account # 32 – Kurt Stocks, Patelco Credit Union Acct ***473661

202.    The Kurt Stocks, Patelco Credit Union account ***3661 ("STO***3661") was opened prior

to the investigation period of January 1, 2012 and remained open through July 31, 2017.   Analyzing

STO***3661 from March 1, 2017 to current revealed that it had received $16,212 from the Holding

Account- Santara Technology Solutions, Inc. SAN***1948 on June 14, 2017 which was entirely SUA

proceeds.  Funds held in this account are dispensed through the use of a debit card and checks for personal

expenses but as of July 31, 2017, much of the original SUA proceeds remained in the account.  As of July 31,

2017, STO***3661 held a balance of $15,018.90.

*Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under 18 U.S.C. § 981(a)(1)(A)*

203.    Applying 18 U.S.C. § 981(a)(1)(A), I believe that none of the funds (both illicit and clean) in

STO***3661 between June 14, 2017 through July 31, 2017, were involved in money laundering transactions.

*Forfeiture Theory: Direct Tracing of SUA Deposits under 18 U.S.C. § 981(a)(1)(C) within one year from the date of this affidavit as fungible property under 18 U.S.C. § 984*

204.    Between from June 14, 2017 through July 31, 2017, $16,212 in SUA proceeds have been

deposited into STO***3661 within the last year tracking period used from November 1, 2016 through

October 31, 2017.  Although the account carried a balance of $15,018.90 as of July 31, 2017, $16,212 in

funds would be forfeitable under 18 U.S.C. §§ 981(a)(1)(C) and 984 (one year deposits).

*Forfeiture Theory: Direct Tracing of SUA Proceeds under 18 U.S.C. § 981(a)(1)(C)*

205.    Banking records were analyzed for STO***3661 between the period of March 1, 2017 and July 31, 2017.  A GIFO analysis was conducted for the account and <u>all</u> funds on account, as of July 31, 2017, were found to be traceable to the illegal gaming operation.  Applying 18 U.S.C. § 981(a)(1)(C), <u>$15,018.90</u> in STO***3661 as of July 31, 2017 are subject to forfeiture.

## X.    VEHICLES PURCHASED WITH PROCEEDS OF GAMING

### A. 2015 Mercedes-Benz, ML350, VIN: 4JGDA5HB9FA479275

206.    On or about July 22, 2016, STOCKS issued check number 1002 from the Santara Technology Solutions, Inc. account SAN***1948 to "Mercedes Benz of El Dorado Hills" in the amount of $53,970 with the memo of: "R17957."  When this check was processed on February 28, 2017, $6,789.03 of the $53,970 was directly traceable as SUA proceeds and forfeitable under 18 U.S.C. Section 981(a)(1)(C).  However at the time of the purchase, SAN***1948 had been utilized as a Holding Account and recipient of funds from Pass-Through Accounts under identities designed to conceal a connection to SweepsCoach and Burkiworks which would expose all of the funds utilized in the purchase of the vehicle forfeitable under 18 U.S.C. Section 981(a)(1)(A).  Although the full purchase price of the vehicle is unknown at this time, at least <u>$6,789.03</u> in directly traced SUA proceeds were used to purchase the asset.

207.    A check of the Carfax commercial database confirms the purchase date of July 22, 2016 with an initial registration date with the State of California on August 10, 2016.  A check with the California Department of Motor Vehicles confirms that this vehicle was registered on August 10, 2016 with STOCKS as the owner.  The vehicle was assigned the plate of "7DQM928."  According to Carfax and the California Department of Motor Vehicles, the vehicle is still owned by STOCKS.  The 2015 Mercedes-Benz was seen on October 18, 2017 driven by STOCKS during surveillance in El Dorado Hills, California.

### B. 2016 Ford, F150 Super Cab Pickup, VIN: 1FTFX1EGXGKG04896

208.   On or about February 20, 2017, MECHAM issued check number 350 from the Black Rock Investments account BLA***6523 to "LHM Ford Lincoln-Provo" in the amount of $24,000 with the memo of: "Deal #44847 F-150."   At the time that this check was processed on February 28, 2017, all of the $24,000 was directly traceable as SUA proceeds and forfeitable under 18 U.S.C. Section 981(a)(1)(C).  On or about February 28, 2017, MECHAM issued check number 2168, from the Black Rock Investments account BLA***5629 to "Larry H Miller Ford Lincoln-Provo" in the amount of $14,000 with the memo of: "Deal #44847 F-150."   At the time that this check was processed on February 28, 2017, none of the $14,000 was directly traceable as SUA proceeds or forfeitable under 18 U.S.C. Section 981(a)(1)(C).  However, at the time of the purchase, both bank accounts were operating as Pass-Through Accounts for the purposes of moving money away from Primary Source Accounts to Holdings Accounts and all of the funds utilized in the purchase of the truck were forfeitable under 18 U.S.C. Section 981(a)(1)(A).   Although the full purchase price of the vehicle is unknown at this time, at least $24,000 in directly traced SUA proceeds were used to purchase the asset.

209.   A check of the Carfax commercial database confirms the purchase date of February 20, 2017 with an initial registration date with the Utah Motor Vehicle Department on March 3, 2017.  A check with Utah Department of Motor Vehicles confirms that this vehicle was registered on April 7, 2017 with MECHAM as the owner listing a Provo, Utah address.  The vehicle was assigned the personalized Utah plate of "F1SH0N."  The 2016 Ford F150 has since been seen parked in front of the office suites located at 895 Embarcadero Drive in El Dorado Hills, California, which is in the same parking lot of the SweepsCoach/Burkiworks office located at 877 Embarcadero.  The most recent sighting of this vehicle was on October 18, 2017 at 895 Embarcadero Drive, El Dorado Hills, California.

**C.  2017 Ford, F250 Super Duty Pickup, VIN: 1FT7X2BT6HEB22700**

210.    On or about March 22, 2017, STOCKS issued check number 1029 from the Santara

Technology Solutions, Inc. account SAN***1948 to "Hoblit Motors" in the amount of $52,421.93 with the

memo of: "F11366." At the time that this check was processed on March 28, 2017, $48,849.72 of the

$52,421.93 was directly traceable as SUA proceeds and forfeitable under 18 U.S.C. Section 981(a)(1)(C).

Furthermore, SAN***1948 had been utilized as a Holding Account and recipient of funds from Pass-

Through Accounts under identities designed to conceal a connection to SweepsCoach and Burkiworks which

would expose all of the funds utilized in the purchase of the vehicle forfeitable under 18 U.S.C. Section

981(a)(1)(A). Although the full purchase price of the vehicle is unknown at this time, at least $48,849.72 in

directly traced SUA proceeds were used to purchase the asset.

211.    A check of the Carfax commercial database confirms an odometer reading on March 22, 2017

to begin the sale process and later a purchase date of March 28, 2017. A check with the California

Department of Motor Vehicles confirms that this vehicle was registered on March 28, 2017 with STOCKS as

the owner. The vehicle was assigned the plate of "42136E2." According to Carfax and the California

Department of Motor Vehicles, the vehicle is still owned by STOCKS. The 2017 Ford F250 has been seen

parked in numerous times in front and on the side of the office suite located at 877 Embarcadero Drive in El

Dorado Hills, California, the SweepsCoach/Burkiworks office. The vehicle was first scene on May 10, 2017

at the location still wearing a "Hoblit Ford" paper license plate. The most recent sighting of this vehicle was

on October 18, 2017.

## XI.    SEIZURE INFORMATION

212.    Many of the SweepsCoach Entities and subsidiary recipient accounts are subject to forfeiture

under all theories presented above, some are subject to forfeiture under one, two or none of the theories

outlined. As discussed, many of the accounts were used for a period of time and closed with their balances

transferred into the control of another account. Although many of these accounts were subject to forfeiture

as identified above, only those which were open as of July 31, 2017 and maintained an account balance are subject to seizure. In addition, three vehicles were purchased with tainted funds. Below is a summary chart identifying the assets, the applicable forfeiture theory, and the amount subject to forfeiture under each theory with the primary seizure theory presented in bold and italicized font:

## A. Financial Accounts Requested for Seizure

| Account ID Number Referenced in Affidavit | Account Holder | Bank | Account | First Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under Title 18 U.S.C. § 981(a)(1)(A) | Second Forfeiture Theory: Direct Tracing of SUA Deposits under Title 18 U.S.C. § 981(a)(1)(C) within one (1) year from the date of this affidavit as fungible property under Title 18 U.S.C. § 984 | Third Forfeiture Theory: Direct Tracing of SUA Proceeds under Title 18 U.S.C. § 981(a)(1)(C) |
|---|---|---|---|---|---|---|
| 8 | Burkiworks | Bank of America | BUR***4044 | *All Funds in Account* | Up to $2,081,492.32 | $142,710.45 as of July 31, 2017 |
| 13 | Baboon Productions | High Desert Bank | BAB***2813 | *All Funds in Account* | None | $10,356.55 as of July 31, 2017 |
| 15 | Lakeview Technologies | Wyochem FCU | LAK***648-S9 | *All Funds in Account* | None | $21,532.16 as of July 31, 2017 |
| 16 | Black Rock Investments | First Citizens Bank | BLA***6523 | *All Funds in Account* | Up to $299,066.50 | $59,404.60 as of July 31, 2017 |
| 17 | Lemon Gold Ventures | Bank of America | LEM***7073 | *All Funds in Account* | Up to $263,456.42 | $71,934.06 as of July 31, 2017 |
| 18 | Lemon Gold Ventures | Bank of America | LEM***0675 | *All Funds in Account* | None | $42,389.42 as of July 31, 2017 |
| 19 | Lemon Gold Ventures | Mechanics Bank | LEM***3421 | *All Funds in Account* | Up to $66,572.63 | $56,720.18 as of July 31, 2017 |
| 20 | Oakridge Management | 1st Bank (Glacier Bank) | OAK***8915 | *All Funds in Account* | None | $22,732.67 as of July 31, 2017 |
| 24 | Redwood Ventures | Bank of America | RED***5652 | *All Funds in Account* | None | $4,466.80 as of July 31, 2017 |
| 25 | Coyote Ridge Outfitters | SAFE CU | COY***2910(9) | *All Funds in Account* | Up to $40,731.35 | $785.55 as of July 31, 2017 |
| 26 | Madrone Ventures | El Dorado Savings Bank | MAD***2902 | *All Funds in Account* | None | $3,298.26 as of July 31, 2017 |
| 27 | Pacific Ridge Management | High Desert Bank | PAC***2826 | *All Funds in Account* | None | $7,332.84 as of July 31, 2017 |
| 28 | Santara Technology Solutions | Umpqua Bank | SAN***1948 | *All Funds in Account* | Up to $284,913.53 | $320,334.01 as of July 31, 2017 |
| 29 | Sierra Executive Group | Tri-Counties Bank | SIE***9991 | *All Funds in Account* | Up to $12,300.00 | $3,271.45 as of July 30, 2017 |
| 30 | Washington Sinclair Technologies, Inc. | Bank of America | WAS***7633 | *All Funds in Account* | Up to $160,013.00 | $134,768.99 as of August 31, 2017 |
| 31 | Cameo Holdings, Inc. | UniWyo FCU | CAM***1324 | *All Funds in Account* | Up to $113,809.91 | $60,408.73 as of August 31, 2017 |
| 32 | Kurt Stocks | Patelco CU | STO***3661 | No Funds in Account | *Up to $16,212.00* | $16,212 as of July 31, 2017 |

## B. Vehicles Requested for Seizure

| Vehicle | Date Purchased | First Forfeiture Theory: Forfeiture of Funds Involved in a Money Laundering Transaction under Title 18 U.S.C. § 981(a)(1)(A) | Third Forfeiture Theory: Direct Tracing of SUA Proceeds under Title 18 U.S.C. § 981(a)(1)(C) |
|---|---|---|---|
| 2015 Mercedes-Benz, ML350, VIN: 4JGDA5HB9FA479275 | July 22, 2016 | *Entire Vehicle* | $6,789.03 in proceeds used for purchase |
| 2016 Ford, F150 Super Cab Pickup, VIN: 1FTFX1EGXGKG04896 | February 20, 2017 | *Entire Vehicle* | $24,000.00 in proceeds used for purchase |
| 2017 Ford, F250 Super Duty Pickup, VIN: 1FT7X2BT6HEB22700 | March 2, 2017 | *Entire Vehicle* | $48,849.72 in proceeds used for purchase |

## XII.   CONCLUSION

213.   In recent months and as evidenced from surveillance during the course of the investigation,

STOCKS, MECHAM and EDWARDS rarely visit, or spend substantial time, at the

Page 98  AFFIDAVIT OF Jason E. Lamb

SweepsCoach/Burkiworks office (SUBJECT BUSINESS PREMISES- SITE 1) in order to conduct their business. The business mail is now directed to a mail box in Zephyr Cove, Nevada and gaming proceeds are deposited directly into the SweepsCoach Entities bank accounts by customers throughout the United States on daily basis. STOCKS and EDWARDS can respond to customer inquiries and load credits onto internet café operator accounts without leaving their homes. Banking records reveal that STOCKS periodically travels through Southern California to locations where internet gaming cafés have been established and deposit funds into SweepsCoach Entities bank accounts with much of his responsibilities handled out of the business office.

214.    Not only is the evidence of the criminal activity important to locate during the search of the premises, equally important is tracking and locating the fruits of the crime which have been obfuscated through the incorporation of numerous seemingly unrelated entities and channeled through bank accounts at various financial institutions as laid out in the financial analysis previously established in this affidavit. Many of the entities assumed by MECHAM, STOCKS and EDWARDS did not have amended articles of incorporation established listing them as persons with a controlling interest. In the entities where the articles of incorporation were amended, the officers were not generally identified in a publically accessible way without obtaining the records from the respective secretary of state offices in Nevada and Wyoming making the identification of the true owners more time consuming.

215.    Most of the funds held in bank accounts by MECHAM, STOCKS and EDWARDS are in accounts held by entities to which they possess signatory control but without registered ownership within the state of incorporation. All of the bank accounts that have been successfully identified during the course of this investigation were found by following the movement of illegal gaming proceeds from one account to the next, issuing a subpoena and waiting to see if the recipient account was a true business transaction or another conduit to secrete illicit funds.

216.     Bank accounts were not the only assets held under entity names by MECHAM, real estate was also purchased under many of the entities identified earlier in this affidavit.  In fact, dozens of properties were found to have been purchased under identities such as Liberty Enterprises AZ, LLC; Liberty Enterprises UT, LLC and Riverbend AZ, LLC, while very few were purchased under MECHAM's name.  A thorough review of the banking records has revealed that MECHAM, STOCKS and EDWARDS have sent or received funds by wire to numerous real estate companies or title agencies.  Between August 2012 and May 2017, thirty-five (35) individual wire transfers were made to title companies or real estate brokers totaling more than $3.2 million with much of the funds being SUA proceeds.  At present, most of these transactions have not been connected to an identified parcel of real estate as the purchases do not appear to have been made under the identities of MECHAM, STOCKS, EDWARDS or other identities known and laid out in this affidavit.  Notices such as the one found in the trash as 2489 Highland Hills Drive, El Dorado Hills, California (SUBJECT RESIDENCE- SITE 4) establish a vital link to assets not otherwise identifiable.  Furthermore, this notice for a property held under an entity name was sent to the SUBJECT BUSINESS PREMISES- SITE 2 before it was brought back to SUBJECT RESIDENCE- SITE 4 and disposed which means evidences of asset ownership may be found at any of the premises identified in this affidavit described in Attachments A-1 through A-4.

217.     Based on all of the facts and circumstances described in this affidavit for search warrant, along with my training, experience, and consultations with others, there is probable cause to believe that the items described in Attachments B are currently located at the premises known as described in Attachments A-1 through A-4, and that those items constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. § 371 (conspiracy to commit offenses against the United States); 18 U.S.C. § 1955 (operation of an illegal gambling business); 18 U.S.C. §§ 1956 and 1957 (money laundering); and 18 U.S.C. § 1962(c) and (d) (conducting and conspiring to conduct the affairs of an enterprise, which enterprise was engaged in, and

the activities of which affected, interstate or foreign commerce, through a pattern of racketeering activity, consisting of the operation of illegal gambling businesses). I believe probable cause exists that the companies described as the SweepsCoach Entities, through the owners and employees of these companies, conspired with separate business owners to provide equipment for, train employees to operate, and maintain the equipment for these internet gaming café businesses in the states of California and Arizona. Furthermore, the fruits of the crime were channeled through an elaborate organization of financial accounts to conceal the funds and disguise their origins. In the process, the funds within these accounts and assets purchased as described, have become subject to forfeiture under either or both Title 18 U.S.C. Sections 981(a)(1)(A) or 981(a)(1)(C).

## XIII.   REQUEST FOR SEALING

218.   Because this investigation is ongoing, disclosure of the search and seizure warrants, this affidavit and the applications could jeopardize the progress of the investigation and cause suspects to destroy evidence or impede the progress of additional investigation. Accordingly, I request that the Court issue an order that the search warrant and seizure warrants, this affidavit and the applications be filed under seal..

_____
JASON E. LAMB
Special Agent, Internal Revenue Service- Criminal Investigation

Read and approved as to form.

_____
JARED C. DOLAN
KEVIN C. KHASIGIAN
Assistant United States Attorneys

Subscribed and sworn to before me
this /5 day of November 2017

_____
United States Magistrate Judge Edmund F. Brennan

Page 101  AFFIDAVIT OF Jason E. Lamb

AO 109 (Rev. 11/13) Warrant to Seize Property Subject to Forfeiture

# United States District Court

### **EASTERN** District of **CALIFORNIA**

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)* | **WARRANT TO SEIZE PROPERTY**<br>**SUBJECT TO FORFEITURE** |
| All funds maintained at Mechanics Bank account number<br>42073421, held in the name of Lemon Gold Ventures, Inc. | CASE NUMBER: |

To:     Any authorized law enforcement officer

2 1 7 - SW - 0 9 6 2     EFB

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the  EASTERN  District of  CALIFORNIA  be seized as being subject to forfeiture to the United States of America.  The property is described as follows:

**All funds maintained at Mechanics Bank account number 42073421, held in the name of Lemon Gold Ventures, Inc.**

The property is subject to seizure pursuant to 18 U.S.C. § 981(b) and subject to forfeiture pursuant to 18 U.S.C §§ 981(a)(1)(A), 981(a)(1)(C), and 984.

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property within 14 days in the daytime 6:00 a.m. to 10:00 p.m.  You must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to EDMUND F. BRENNAN or Any U.S. Magistrate in the Eastern District of California.

| | |
|---|---|
| 11-1-2017 at 2:40 p.m.<br>Date and Time Issued | *Judge's signature* |
| Sacramento, California<br>City and State | Edmund F. Brennan, U.S. Magistrate Judge<br>*Printed name and title* |

# SEALED

AO 109 (Rev. 11/13) Warrant to Seize Property Subject to Forfeiture (Page 2)

## RETURN

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of:

Inventory of the property taken:

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

Subscribed, sworn to, and returned before me this date.

_____           _____
U.S. Judge or Magistrate                          Date